PAUL E. VALENTINO, Plaintiff-Appellee, v. DAVID HILQUIST *et al.*, Defendants-Appellants.

First District (5th Division)    No. 1—01—2407

Opinion filed January 24, 2003.—Rehearing denied April 3, 2003.

462

Scariano, Ellch, Himes & Petrarca, Chtrd., of Chicago (Anthony G. Scariano, Paulette A. Petretti, and Darcee C. Young, of counsel), for appellants.

Steven J. Rosenberg, P.C., of Chicago (Steven J. Rosenberg, William M. Walsh, and Daile Grigaitis, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff Paul Valentino, a former employee of Oakton College, brought this action against defendants, the Board of Trustees of Oakton College (Board) and David Hilquist, the vice president of business and finance of Oakton College, to recover damages for alleged intentional battery, intentional infliction of emotional distress and breach of employment contract. Following a jury trial, judgment was entered in favor of plaintiff against the Board for $750,000 and against Hilquist for $600,000.

Defendants appeal from: (1) the trial court's failure to apply applicable immunities and defenses; (2) the trial court's rulings on pretrial motions, evidentiary rulings and jury instructions; and (3) the judgment, as being against the manifest weight of the evidence. Defendants also appeal the trial court's order denying defendants' request to waive presentment of an appeal bond on behalf of Hilquist. For the following reasons, we reverse in part, affirm in part and remand with directions.

## I. BACKGROUND

Plaintiff worked as the director of facilities at Oakton College from February 1992 until June 1998. Oakton College is governed by the Board, which consists of seven elected trustees. Plaintiff's direct supervisor at the college was Hilquist, who had been employed with the college since 1972.

Plaintiff's duties as director included the supervision of the day-to-day operations of the college's facilities located on its two campuses in Des Plaines and Skokie. Plaintiff was employed with the college under an employment contract providing for one-year terms (July 1 through June 30), which would be automatically renewed each year unless plaintiff received written notice of nonrenewal at least three months prior to expiration of the contract.

Plaintiff filed this action on February 4, 1998. The fifth amended complaint alleged counts in battery as to both Hilquist and the Board, intentional infliction of emotional distress as to both Hilquist and the Board and breach of contract as to the Board. After filing the action, plaintiff received a letter from Margaret Lee, the college's president, informing him that she would not recommend renewal of plaintiff's employment contract for the year 1998-99 to the Board. Plaintiff alleged that he received that letter on his desk in April of 1998, after the March 31 deadline for timely notification of nonrenewal. Plaintiff's employment contract was not renewed for the year 1998-99.

At trial, plaintiff testified that from 1992 until 1997, he was subjected to physical and verbal abuse from Hilquist. Plaintiff testified that during that time period he was the subject of Hilquist's physical abuse about 100 times. The abuse consisted of kicking plaintiff underneath the table during meetings, pushing his face against a window, pushing him against the wall and grabbing his arm. The abuse occurred in Hilquist's office, the conference room, the board-room, the hallway and in the woods on campus. Plaintiff testified that during that time period, he was also subjected to verbal abuse from Hilquist daily. Hilquist would "scream" at plaintiff in person, before and after meetings, and over both plaintiff's office and home telephones. Plaintiff testified Hilquist would call him at home, often after midnight, and "scream" at him. Plaintiff testified Hilquist called him profane names and that toward the end of 1997 the abuse intensified.

During the time period from 1992 through 1997, plaintiff testified he reported the abuse to Joan Hall, a Board member, three to four times per week. Plaintiff testified he reported the abuse to Board members Marvin Walker, about 40 times; Ellen Schrodt, 4 or 5 times per year; Jody Wadhwa, about 12 times; Larry Goldberg, 5 or 6 times;

and Amilda Mader, about 4 or 5 times. Plaintiff testified that in response to these reports he was told to "hang in there." Plaintiff also testified he reported the abuse to the chief of public safety at the college and to the chief of the Des Plaines police department.

Plaintiff additionally testified that he reported the abuse to Margaret Lee, the president of Oakton, on at least 10 occasions. Plaintiff testified that on three different occasions in 1997, Lee told him she not only agreed with Hilquist, but condoned what he was doing.

Plaintiff testified that during October 1997 he was taken to the hospital from the college by ambulance because of his blood pressure. Following the hospitalization, on November 1, 1997, plaintiff went to see Lee and again reported the abuse. Plaintiff testified that Lee told him he was an embarrassment to the college and that she agreed with Hilquist's conduct. In June 1998, on plaintiff's last day of work, Hilquist called plaintiff's office, swore at him and told him to turn in his keys and leave. When plaintiff went to his office, Hilquist blocked him from leaving, yelled at him again in the hallway, and then pushed him into the wall resulting in a cut to plaintiff's hand. Plaintiff was then taken to the hospital for his blood pressure. Plaintiff additionally complained of deteriorating health while working for Hilquist, including stomach problems, trouble sleeping, headaches and blurred vision. Plaintiff began to see a psychologist, Debra Haley, in the latter part of 1997 and continued seeing her through the beginning of 1998.

Anthony Schimel, chief heating, ventilation and air-conditioning engineer for Oakton, testified that in the winter of 1997 he saw Hilquist poke plaintiff in the chest and then push him into the hallway. Schimel also testified that, some months after that incident, he was standing with Hilquist and plaintiff in the hallway and requested to raise the water temperature in the building. Hilquist responded, motioning to plaintiff, "Kill him, I'll give you 180 degree water."

Loretta Fivissani, plaintiff's secretary, testified that in the last two years plaintiff was employed with Oakton, she went to speak with Lee about the relationship between Hilquist and plaintiff. Fivissani testified that she told Lee that Hilquist harassed plaintiff daily with constant demanding calls and verbal abuse. Lee responded "I probably shouldn't say this, but I have to tell you that a decision has been made and I told [Hilquist] to handle it and it had to be done in the proper order."

Debra Haley, Ph.D., testified that plaintiff came to see her in November 1997. Plaintiff told her that his boss was physically and verbally abusing him. Haley testified that plaintiff was suffering from generalized anxiety disorder. Both Jeff Valentino, plaintiff's son, and

June McCubbin, plaintiff's former fiancée, testified as to the deterioration in plaintiff's health during his employment with Oakton.

During plaintiff's case in chief, Margaret Lee, president of the college, testified that she received a letter on May 31, 1997, from Joan Hall. The letter stated, in relevant part:

> "Paul had approached me about his problems with [Hilquist] some time before he gave this book to me [prior to October 1994]. *** The Paul Valentino I knew then was frustrated beyond belief over what he knew had to be done and then having to butt his head every time he tried to do it; also, someone who had been treated by [Hilquist] in ways (I documented this) that a lesser person would have seen [as] an opportunity to file a juicy lawsuit. *** Also, our track record with our Directors of Facilities would seem to call for curiosity/investigation to learn why we have not been able to keep people in that job for more than a year or two for many years."

Lee admitted she did not question Hilquist or plaintiff about the substance of the letter. Lee testified that although plaintiff was having an "extremely" hard time performing his job, his contract for the year 1997-98 was renewed, with the provision he was on probation with no increase in salary. Lee admitted that Hall had approached her on "several" occasions about problems between Hilquist and plaintiff, but that she was only told of general problems, not specific allegations of abuse. Lee also admitted that Fivissani, plaintiff's secretary, came to see her, although she could not recall exactly what Fivissani said, only that she was "concerned" about plaintiff's condition.

On cross-examination, Lee testified that after plaintiff received a poor quarterly evaluation from Hilquist, he requested to report to Lee directly and avoid Hilquist completely because plaintiff felt unfair demands were being placed on him. Lee also testified on cross-examination that during plaintiff's tenure, a library ceiling collapsed at the Skokie campus and pipes burst at the Des Plaines campus. Lee maintained that she never witnessed Hilquist abuse plaintiff. She also maintained that Schimel and Harstein never contacted her to inform her of any abuse.

During defendants' case in chief, Hilquist testified that on October 30, 1997, the day plaintiff was transported to the hospital, he had a meeting with plaintiff to review a negative evaluation. Hilquist also testified as to plaintiff's poor performance in his duties as director during his tenure, which included, for example, failure to handle snow removal and flood concerns, general lack of maintenance and failure to clean duct work. Hilquist testified he never pushed, kicked, or hit plaintiff. Hilquist testified he never screamed at plaintiff, although he may have raised his voice on occasion. Hilquist denied telling Schimel he would raise the temperature of the water if Schimel killed plaintiff.

During defendants' case in chief, Lee again testified that no trustee told her that plaintiff was being physically or verbally abused by Hilquist. Lee testified that plaintiff never reported physical or verbal abuse on the part of Hilquist. Lee also testified that she never told plaintiff that she approved of or condoned any physical acts on the part of Hilquist.

At the close of all the evidence, the jury returned verdicts in favor of plaintiff and against the Board on battery, intentional infliction of emotional distress, and breach of contract in the amount of $750,000. The jury also returned verdicts in favor of plaintiff and against Hilquist on battery and intentional infliction of emotional distress in the amount of $600,000. On February 6, 2001, the trial court entered judgment against both defendants on these awards. On June 11, 2001, the trial court denied defendants' timely postjudgment motions. Defendants now appeal.

II. ANALYSIS

Defendants first contend that the trial court erred in denying their motion for partial summary judgment. Defendants' arguments in this section involve the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1— 101, 2—201, 2—109, 3—108 (West 1996)) and the Workers' Compensation Act (820 ILCS 305/5(a) (West 1996)). Plaintiff maintains that under Illinois law, the denial of a motion for summary judgment is not reviewable on appeal. *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 577 (1994); *Tripi v. Landon*, 140 Ill. App. 3d 230 (1986).

■ It is well settled that a prior order denying a motion for summary judgment is not reviewable following an evidentiary trial, because the result of any error in such denial is merged by law in the subsequent trial. *Thurmond v. Monroe*, 235 Ill. App. 3d 281, 285 (1992); *Pleasure Driveway & Park District v. Kurek*, 27 Ill. App. 3d 60 (1975). However, these cases are inapplicable to the case at bar because defendants' arguments involving the Tort Immunity Act and Workers' Compensation Act were not presented to the jury. Therefore, any error in the denial of summary judgment based on these issues was not merged in the subsequent trial. In addition, cases hold that where an appeal is otherwise properly before the appellate court from a final judgment, the court may review the denial of a motion for summary judgment. See *Novak v. Insurance Administration Unlimited, Inc.*, 91 Ill. App. 3d 148, 152 (1980); *Cedric Spring & Associates, Inc., v. N.E.I. Corp.*, 81 Ill. App. 3d 1031, 1034 (1980); *Reznick v. Home Insurance Co.*, 45 Ill. App. 3d 1058, 1059 (1977). The procedural setting of those cases made the review of the denied motion acceptable. In those cases,

as here, the denied motion was filed by the party taking the appeal from an otherwise final judgment. *Rambert v. Advance Construction Co.*, 134 Ill. App. 3d 155, 165 (1985).

■ Therefore, we will review defendants' arguments on appeal. The grant or denial of summary judgment is reviewed on appeal *de novo. Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1091 (1997). The function of the appellate court on review of summary judgment is to determine whether the trial court properly determined that no genuine issue of material fact had been raised, and if none was raised, whether judgment was proper as a matter of law. *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 724 (1997).

## A. THE BOARD

### 1. The Tort Immunity Act

We address defendants' arguments in logical order. Defendants maintain that section 3—108 of the Tort Immunity Act (745 ILCS 10/3—108(a) (West 1996)) immunizes the Board from liability. We agree.

■ Plaintiff argues that the Board "did nothing to control Hilquist's conduct." This claim amounts to negligence for failure to supervise. At the time of plaintiff's alleged injuries, section 3—108(a) of the Tort Immunity Act stated:

> "(a) Except as otherwise provided by this Act *** neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3—108(a) (West 1996).

It should be noted that section 3—108(b) was amended, effective December 2, 1998, to include a willful and wanton exception; however, that amendment is not to be applied retroactively. See *Henrich v. Libertyville High School*, 186 Ill. 2d 381 (1998). Therefore, at the time pertinent to this case, section 3—108 provided full blanket immunity for government entities acting in a supervisory capacity. As this court noted in *Gusich v. Metropolitan Pier & Exposition Authority*, 326 Ill. App. 3d 1030, 1033 (2001), quoting Webster's Third New International Dictionary 2296 (1986), "[t]he plain and ordinary meaning of 'supervise' is to 'oversee with the powers of direction and decision the implementation of one's own or another's intentions.' " Similarly, in *Moorehead v. Metropolitan Water Reclamation District of Greater Chicago*, 322 Ill. App. 3d 635 (2001), we noted that for purposes of section 3—108, the term " 'supervision' includes coordination, direction, oversight, implementation, management, superintendence, and regulation." *Moorehead*, 322 Ill. App. 3d at 639.

The facts in *Guisch* and *Moorehead* demonstrate that the im-

munity granted under section 3—108(a) has been interpreted quite broadly. In *Guisch,* the Pier Authority had ordered a maintenance contractor not to clean the area of the facility where the plaintiff was injured later that same day. This court held that this cleaning directive fell directly under "[t]he plain and ordinary meaning of [the term] 'supervise' " and, therefore, the Pier Authority was entitled to the protection of section 3—108 as a matter of law. *Guisch,* 326 Ill. App. 3d at 1033. In *Moorehead,* this court applied section 3—108 immunity to a plaintiff's construction-related injury where the Water Reclamation District oversaw a contractor's work in order to assure itself that the plans and specifications of a construction contract were being followed. *Moorehead,* 322 Ill. App. 3d at 638-40.

In *In re Chicago Flood Litigation,* 176 Ill. 2d 179, 193 (1997), our supreme court held that given the unambiguous language of section 3—108(a), the City of Chicago was absolutely immune from liability in connection with allegations that it failed to provide proper supervision of the actions of a company that installed pilings in the Chicago River, resulting in the flooding of the city's underground tunnel system. See S. Puiszis, Illinois Municipal Tort Liability (2d ed. 2001 & Supp. 2002) (for an excellent discussion of section 3—108(a) of the Tort Immunity Act (745 ILCS 10/3—108(a) (West 1996))).

■ In the case at bar, the amount of control retained by the Board is the essence of a supervisory relationship. Accordingly, section 3—108 applies, barring plaintiff's cause of action against the Board. Public policy considerations also support this conclusion. "The purpose of the Tort Immunity Act is to protect local governments and their employees from liability arising out of the operation of government." *Board of Trustees of Community College, District No. 508 v. Coopers & Lybrand, L.L.P.,* 296 Ill. App. 3d 538, 548 (1998), citing *DiMarco v. City of Chicago,* 278 Ill. App. 3d 318, 322 (1996). The court in *Board of Trustees* continued:

> "The Board members in the instant case are public servants who serve without compensation. [Citation.] The possibility of incurring multimillion dollar liability could chill their willingness and deter them from providing such a service." *Board of Trustees of Community College,* 296 Ill. App. 3d at 548.

Defendants additionally argue that section 2—109 of the Tort Immunity Act (745 ILCS 10/2—109 (West 1996)) is also available to immunize the Board in this case. As we have determined that section 3—108 immunizes the Board, we need not address this argument. Similarly, we need not reach the Board's alternative claim for relief based on the exclusivity provision in the Worker's Compensation Act (820 ILCS 305/5(a) (West 1996)).

2. Breach of Contract

■ Defendant Board argues that the evidence failed to establish a breach of contract claim. Specifically, the Board maintains that plaintiff received timely notification of the cancellation of his employment contract when the letter of nonrenewal was mailed, which was within the designated three-month period. Plaintiff responds that he did not receive the mailed letter and only learned of the cancellation of his contract when a hand-delivered letter was found on his desk some time in April 1998. Therefore, plaintiff maintains that the Board breached the employment contract.

Plaintiff's employment contract provided that "administrators will receive a three-month notice for nonrenewal." Plaintiff does not dispute that the envelope containing his notice of nonrenewal was postmarked March 31, 1998. Plaintiff merely maintains that, per the contract, he must actually *receive* the letter for notification to occur. We disagree.

"It is established that when no method of service has been provided by statute, the decision of an administrative agency will be deemed served when mailed." *Board of Education of St. Charles Community Unit School District, No. 303 v. Adelman*, 137 Ill. App. 3d 965, 968 (1985), citing *Cox v. Board of Fire & Police Commissioners*, 96 Ill. 2d 399, 403 (1983). This court has recently reaffirmed this rule in *Nudell v. Forest Preserve District*, 333 Ill. App. 3d 518 (2002), *appeal allowed*, 202 Ill. 2d 614 (2003). There, we noted that section 3—103 of the Administrative Review Law (735 ILCS 5/3—103 (West 1998)) provides:

> "Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision ***." 735 ILCS 5/3—103 (West 1998).

"A decision is considered served when it is deposited in the United States mail." *Nudell*, 333 Ill. App. 3d at 522, citing *Lutheran General Health Care System v. Department of Revenue*, 231 Ill. App. 3d 652, 659 (1992).

If the mailbox rule is applicable to the statutory language "the date that a copy *** was served upon the party affected," it must logically be applicable to the instant contract provision "administrators will receive a three-month notice for nonrenewal." Therefore, plaintiff's termination letter will be deemed received when mailed. Consequently, plaintiff did receive notice of the nonrenewal within the three-month period, and hence, no breach of contract occurred. Plaintiff, relying on *Liquorama, Inc. v. American National Bank &*

*Trust Co. of Chicago*, 86 Ill. App. 3d 974 (1980), argues that a presumption arises that mail is received by an addressee if the mail is properly addressed and has proper postage, but that presumption is rebutted if the addressee denies receipt of the mail. This argument misinterprets *Liquorama*. There the court stated that the lessee's letter did not bear the lessor's correct address. "This fact also bars use of the presumption rendering the question of receipt an issue for the trier of fact." *Liquorama*, 86 Ill. App. 3d at 978. Here, there is no allegation that the letter was incorrectly addressed, and therefore, the presumption that plaintiff received the letter stands. See *Orrway Motor Service, Inc. v. Illinois Commerce Comm'n*, 40 Ill. App. 3d 869 (1976) (a party is presumed to have received a properly mailed order).

For all of the above reasons, we reverse the judgments against the Board.

## B. HILQUIST

### 1. Statute of Limitations and Manifest Weight of the Evidence

Hilquist argues that he is entitled to summary judgment on plaintiff's battery claims where plaintiff failed to provide proof of any timely claims. We disagree.

■ Pursuant to section 8—101 of the Tort Immunity Act (745 ILCS 10/8—101 (West 1996)), any civil action against a local governmental agency or employee must be commenced within one year from the date the cause of action accrued. *Greb v. Forest Preserve District*, 323 Ill. App. 3d 461, 465 (2001). Plaintiff concedes as much in his brief, and therefore, the only alleged batteries that were actionable in this case must have occurred within one year of February 4, 1998, the date the complaint was filed.

Plaintiff testified that after February of 1997, after the weekly staff meetings, Hilquist would push his face against a window. Plaintiff testified Hilquist would grab and twist his arm on these occasions as well. Plaintiff testified that from February of 1997 through June of 1998, Hilquist physically abused him weekly, including pushing him on the chest, back and back of the head. Plaintiff testified that from February 1997 through June 1998, Hilquist would kick him under the table at staff meetings.

Defendants point out that plaintiff never even alleged that he was battered until his third amended complaint. Defendants also strenuously argue that plaintiff never produced any evidence that he complained to medical personnel of any injuries from being battered. Defendants further maintain that because the only witness who corroborated Hilquist's physical touching of plaintiff, Schimel, testified that the incident occurred in "winter 1997" and he was unable to give

the exact date, plaintiff is unable to establish the touching occurred within the statute of limitations. In support of their argument, defendants merely cite to generalized rules of law regarding justification for the narrow one-year statute of limitations for claims arising under section 8—101 of the Tort Immunity Act. Indeed, the only case cited by defendants that supports their allegation that the date of the battery must be specific is quoted in text in *Wolf v. Black Hawk College*, No. 3—94—0187 (1995) (unpublished order under Supreme Court Rule 23). Supreme Court Rule 23(e) (166 Ill. 2d R. 23(e)) prohibits the citation of unpublished dispositions as precedential authority. *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 858 (2000).

■ The jury heard the conflicting evidence regarding the date of the incident witnessed by Schimel. The jury heard the testimony of plaintiff, Hilquist and many other witnesses. The jury heard the evidence, weighed it, and made its decision. We cannot usurp the jury's function and substitute our judgment for questions of fact that were fairly submitted, tried, and determined from the evidence presented. *Kamp v. Preis*, 332 Ill. App. 3d 1115, 1124 (2002).

2. Tort Immunity Act

Hilquist next asserts that section 2—201 of the Tort Immunity Act (745 ILCS 10/2—201 (West 1996)) immunizes his conduct. Specifically, Hilquist asserts that his criticism of plaintiff was part of a "discretionary policy determination" to evaluate plaintiff on four occasions as opposed to once during the 1997-98 fiscal year.

■ Section 2—201 of the Tort Immunity Act provides:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of discretion even though abused." 745 ILCS 10/2—201 (West 1996).

Section 2—201 is premised "upon the idea that [public] officials should be allowed to exercise their judgment in rendering decisions without fear that a good-faith mistake might subject them to liability." *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 472 (2001). For section 2—102 immunity to apply, the act or omission must be both a determination of policy and an exercise of discretion. *Harrison*, 197 Ill. 2d at 472. Discretionary acts are those that are unique to a particular public office. *Harrison*, 197 Ill. 2d at 472. Public policy decisions are those that require the governmental entity or employee to "balance competing interests and to make a judgment call as to what solutions will best serve each of those interests." *Harrison*, 197 Ill. 2d at 472.

■ Hilquist creatively attempts to frame his conduct as "criticisms" in the course of discretionary evaluations of plaintiff. That is clearly not the case here. Plaintiff's complaint does not allege "criticisms"; it alleges battery. Plaintiff's complaint alleges that Hilquist verbally and physically abused him on numerous occasions, not just during discretionary evaluations. This conduct certainly does not amount to either an exercise of discretion or determination of policy. As plaintiff asserts, "this case has never been about Hilquist's reviews of plaintiff's job performance or about defendant's hiring and retention decisions." Therefore, section 2—201 does not immunize Hilquist's conduct in this case.

3. Workers' Compensation Act

■ Hilquist next claims that the exclusivity provision in the Workers' Compensation Act (820 ILCS 305/5(a) (West 1996)) bars plaintiff's tort claims for intentional infliction of emotional distress. We disagree.

Section 5 of the Act states:

"No common law or statutory right to recover damages from the employer *** or the agents or employees of *** [the employer] for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act ***." 820 ILCS 305/5(a) (West 1996).

Therefore, "where the negligence of a co-employee arising out of and in the course of employment results in injuries to a fellow worker, the former may plead the act as a bar to a suit for damages by the injured employee." *Jablonski v. Multack*, 63 Ill. App. 3d 908, 914 (1978).

However, courts have held that workers' compensation laws do not immunize an employee from suits for intentional torts against a fellow employee. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 464 (1990); *Johnson v. Federal Reserve Bank of Chicago*, 199 Ill. App. 3d 427, 433-34 (1990). The exclusive remedy of section 5(a) was not intended to be used as a shield against liability by an employee who commits an intentional tort against a fellow worker. *Jablonski*, 63 Ill. App. 3d at 914. Therefore, Hilquist, as an employee who committed an intentional tort, may not raise the Act as a bar to plaintiff's action for damages.

C. JURY INSTRUCTIONS

■ We first address defendants' argument that the jury should have been instructed on the definitions of "severe emotional distress," "extreme and outrageous conduct" and "intent." Our review of the record indicates that defendants never tendered instructions defining

these terms. Supreme Court Rule 366(b)(2)(i) provides: "No party may raise on appeal the failure to give an instruction unless he shall have tendered it." 134 Ill. 2d R. 366(b)(2)(i). See *Fakhoury v. Vapor Corp.*, 218 Ill. App. 3d 20, 26 (1991); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 316 Ill. App. 3d 227, 234 (2000). We reject this portion of defendants' argument. We do find that the trial court improperly instructed the jury regarding plaintiff's counts for intentional infliction of emotional distress, although not for the reasons suggested by defendants. As to count III, intentional infliction of emotional distress as to Hilquist, the judge instructed the jury:

> "[Y]ou must decide the following issues: One, whether defendant Hilquist's actions were extreme and outrageous and two, whether defendant Hilquist either intended that his conduct should inflict severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress and three, whether defendant Hilquist's conduct, in fact caused plaintiff Paul Valentino severe emotional distress."

In the absence of an alternative instruction tendered by defendants, this instruction was proper.

However, as to count IV, intentional infliction of emotional distress as to the Board, the judge instructed the jury:

> "[Y]ou must decide the following issues: One, the plaintiff claims that one or more of the following actions by Hilquist was extreme and outrageous ***."

The instruction then enumerated a list of 11 separate actions for the jury to determine whether they were "extreme and outrageous." The list included:

> "B: Defendant Hilquist pushed plaintiff.*** G: Defendant Hilquist screamed at plaintiff in front of certain committees, wrongly accusing him of improperly handling the stream bank project and others. H: Defendant Hilquist called plaintiff into his office, falsely accused him of not performing his responsibilities and said he had convinced the president that he (plaintiff) would not succeed regardless of performance."

This instruction was improper. Essentially, the instructions to the jury regarding count IV, namely, the language "one or more," made it possible for the jury to return a verdict against the Board if it found even one of the incidents occurred. After reviewing the jury instructions and the applicable parts of the record, the instructions on count III and count IV are not consistent. While instruction III requires the jury to decide whether Hilquist's conduct was "extreme and outrageous," count IV allows the jury to find that only one of the enumerated actions, even a push, could constitute "extreme and outrageous" conduct. This is contrary to Illinois law.

In *McGrath v. Fahey,* 126 Ill. 2d 78, 86 (1988), the supreme court stated with respect to the tort of intentional infliction of emotional distress: "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." (Emphasis omitted.) "Liability only attaches in circumstances where the defendant's conduct is ' "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency ***." ' [Citation.]" *Welsh v. Commonwealth Edison Co.,* 306 Ill. App. 3d 148, 154 (1999). The tort does not arise from threats, insults, indignities, annoyances, or petty oppressions, but from coercion, abuse of power or authority, and harassment. *McGrath,* 126 Ill. 2d at 86-89. The conduct must go beyond all bounds of decency and be considered intolerable in a civilized community. *Kolegas v. Heftel Broadcasting Corp.,* 154 Ill. 2d 1, 21 (1992).

In *Welsh,* employees at a nuclear power station sued their employer on a theory of intentional infliction of emotional distress. The trial court dismissed the count as lacking sufficient factual allegations. On appeal we affirmed. We noted that according to the plaintiffs they were demoted, transferred, forced to perform demeaning and humiliating tasks, including assignments to manually clean manholes " 'infested with bacteria, human waste, and other disgusting matter' and denied permission to use equipment specifically designed for such purposes." *Welsh,* 306 Ill. App. 3d at 150. We held that although the plaintiffs generally alleged anxiety, humiliation, and extreme emotional distress, the complaint contained no factual allegations that rose to the requisite level of severity of emotional distress. "It is the degree of emotional distress actually suffered by a plaintiff which separates the actionable from the nonactionable." *Welsh,* 306 Ill. App. 3d at 155.

The *Welsh* case, although involving a dismissal at the pleading stage, is directive on the type of evidence required to maintain a claim for intentional infliction of emotional distress. In analogizing *Welsh,* certainly one act of pushing, or one act of yelling, would not be sufficiently severe as to establish emotional distress under the facts of the case at bar. The standard for determining the adequacy of jury instructions is whether they were sufficiently clear to avoid misleading the jury, while at the same time, fairly and correctly stating the law. *O'Neil v. Continental Bank, N.A.,* 278 Ill. App. 3d 327, 341 (1996); *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.,* 201 Ill. 2d 260 (2002). We find that the totality of the jury instructions did not accurately state the law. *Kritzen v. Flender Corp.,* 226 Ill. App. 3d 541,

553 (1992). While we have found the instruction given on count III to be proper, it is clear to this court that the jury could have relied on the factors enumerated in the instruction relating to count IV in deciding the verdict on count III. Consequently, we reverse the verdict for plaintiff on count III, intentional infliction of emotional distress as to Hilquist, and remand that count for further proceedings consistent with this order.

We note that in *Sale v. Allstate Insurance Co.*, 126 Ill. App. 3d 905, 924 (1984), a case not cited by either party, this court considered the plaintiff's objection to the following instruction on the elements of the tort of intentional infliction of emotional distress:

> " 'The emotional distress suffered must be severe. Although such things as fright, horror, grief, shame, humiliation and worry may fall within the ambit of the term "emotional distress," these mental conditions alone are not sufficient. In order to be "severe," the distress must be of such intensity and duration that no reasonable person could be expected to endure it.' "

This court rejected plaintiff's argument, holding:

> "The language in this last instruction was taken from our supreme court's opinion, *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767, which quoted comment j to the Restatement (Second) of Torts, section 46 (1965). We hold that the instruction is neither misleading nor confusing." *Sale v. Allstate Insurance Co.*, 126 Ill. App. 3d at 924.

## D. EVIDENTIARY ERRORS

The material in this section is nonpublishable under Supreme Court Rule 23.

## E. INFLAMMATORY, INADMISSIBLE AND PREJUDICIAL TESTIMONY

The material in this section is nonpublishable under Supreme Court Rule 23.

## F. EXCESSIVE DAMAGES

The material in this section is nonpublishable under Supreme Court Rule 23.

## G. APPEAL BOND

Lastly, defendant Hilquist argues that the trial court improperly denied his request to waive the appeal bond. We agree.

On June 6, 2001, the trial court granted the Board's request to waive the appeal bond but denied Hilquist's request. Pursuant to the

Public Community College Act (110 ILCS 805/1—1 (West 2000)), the Board has a duty to indemnify and protect employees against civil damages claims and suits, when damages are sought for acts performed within the scope of employment. Accordingly, the Board has a duty to indemnify Hilquist, and the funding of Hilquist's appeal bond has been supplied by the Board. Therefore, Hilquist should be afforded the same waiver of the bond requirement as the Board.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

CAMPBELL, P.J., and REID, J., concur.