T.C. Memo. 2003-277

UNITED STATES TAX COURT

EDWARD P. KNOLL AND MARY K. KING-KNOLL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10973-99, 5281-00.  Filed September 23, 2003.

<u>Robert J. Paley</u> and <u>Scott A. Carlson</u>, for petitioners.

<u>Sean R. Gannon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and penalties for the taxable
years 1993, 1994, and 1995, as follows:

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 1993 | $18,873 | $3,775 |
| 1994 | 47,756 | 9,551 |
| 1995 | 51,584 | 10,317 |

The issues presented for our consideration are: (1) Whether a $116,000 settlement payment is excludable from gross income under section 104(a)(2);[1] (2) whether $48,420[2] in payments was nontaxable loans or taxable advances; and (3) whether petitioners are subject to section 6662(a) penalties for substantial understatement of tax or negligent disregard of the rules and regulations. To the extent that we hold amounts are includable in gross income, petitioners do not contest that such income is subject to self-employment tax.

### FINDINGS OF FACT[3]

Petitioners Edward P. Knoll and Mary King-Knoll resided in Barrington, Illinois, at the time their petition was filed. During 1965, following his graduation from Northwestern

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2] If the $116,000 and/or $48,420 amounts are includable in income, we must also decide the proper year for inclusion.

[3] The parties' stipulation of facts is incorporated by this reference.

University School of Law, Edward P. Knoll[4] (petitioner) was employed by the law firm of Smith, Clinch, and Powers. Approximately 2 years later, that firm was merged into the law firm of Winston and Strawn (Winston). Following the consolidation, petitioner became an associate of Winston.

Petitioner became an income (nonequity) partner and continued in that status into Winston's taxable year ending January 31, 1993. During his 26 years with Winston, petitioner was primarily involved in the area of general corporate work. His clients included a State agency that issued tax-exempt bonds and a leveraged lease broker. Petitioner also prepared tax returns and acted as a trustee for a client's estate planning trust.

In response to a reduced market and the need to improve profitability, Winston initiated a reduction in force. On March 23, 1992, petitioner along with several other partners, received letters from Gary L. Fairchild, Winston's then managing partner, requesting that they resign from the firm. The weak legal market and the firm's profitability concerns were the only reasons stated in the letter as the basis for asking petitioner to resign.

---

[4] Petitioner, Mary King-Knoll is a party to this case by reason of the fact that she filed joint Federal income tax returns with Edward P. Knoll for the years under consideration.

The March 23, 1992, letter from Mr. Fairchild offered the following terms in return for petitioner's voluntary resignation from the firm: (1) A $55,000 lump-sum payment; (2) receipt of retirement benefits upon qualification, pursuant to the Winston Partnership Agreement as if petitioner had not been severed, but had retired from the firm; and (3) additional payments for approved "Urgent Family Needs" for a period of 3 years.

On April 15, 1992, petitioner received a second letter from Mr. Fairchild which offered, in addition to the terms of the March 23, 1992, letter, payments of $40,000 a year for 3 years. To receive the additional payments, petitioner had to withdraw voluntarily from the firm by April 30, 1992. The payments would commence on the date of petitioner's withdrawal from the firm, and could be counted, if necessary, as additional qualified service for his eligibility to retire and receive benefits from Winston. The Winston retirement benefit was offered pursuant to the firm's partnership agreement, which was subject to modification by the partnership.

Most Winston partners who were being asked to resign received letters similar to the first one received by petitioner. A smaller subset of partners also received letters similar to the second one received by petitioner. The terms of the two letters offered severance packages to petitioner and other Winston

partners. If petitioner had accepted the terms offered in the letters, he would have received payments totaling $175,000.

Petitioner did not voluntarily resign from Winston by the April 30, 1992, deadline. However, as of May 1, 1992, he no longer: (1) Received partnership payments, (2) performed work on behalf of Winston clients, or (3) used Winston office space. Initially petitioner, and eventually his attorneys, negotiated with representatives from Winston in an attempt to reach agreement as to the terms of petitioner's severance. In all, 12 separate drafts of a settlement agreement were negotiated before the final agreement was signed on December 22, 1994.

Negotiations between petitioner and Winston were contentious and lasted approximately 32 months. Initially, petitioner represented himself in talks with Winston. The principal dispute concerned the amount of retirement benefits petitioner was to receive upon his withdrawal from the firm. Petitioner believed that he was entitled to receive a larger annual retirement payment than that offered and that his priority in receiving that payment should be subordinate to only a small group of other retired partners. Petitioner's initial negotiating objective was to increase the amount of his retirement payments and gain assurance that his priority in receiving the retirement payments would not be diluted.

As a result of initial negotiations, Winston completed a first draft of a final settlement agreement on May 29, 1992. This draft included clause 2(b), which provided for a $55,000 lump-sum payment to petitioner. The $55,000 lump-sum payment approximated 5 months of petitioner's partnership income. The draft also included clause 2(c), which provided for $3,333.33 monthly "bridging payments" from May 31, 1992, until such time as petitioner became active in Winston's retirement plan. These monthly payments were essentially the same as the annual payments of $40,000 offered in the original April 15, 1992, severance letter.

The negotiations continued without agreement and the next three proposed drafts of an agreement included similar provisions, but with additional language reducing the $55,000 lump sum by amounts which Winston had already advanced to petitioner. The first four drafts of the agreement provided for total cash payments to petitioner of $165,000. That amount is commensurate with the $175,000 offered under the severance letters. The $10,000 difference appears to be attributable to a 3-month variation in petitioner's retirement date under the letters as opposed to the draft agreements ($3,333.33 x 3 months).

During February 1993, approximately 9 months after negotiations began, petitioner began receiving psychotherapy

treatment for depression.  Petitioner initiated the counseling treatment at the request of his wife, Mary King-Knoll, whose background includes a master's degree in psychology.  Petitioner had been withdrawn from his family's activities, moody, and despondent.  Petitioner received psychotherapy treatment from February 26, 1993, through March 16, 1994.  Prior to this time petitioner had never been treated for depression or other emotional problems.

On February 8, 1994, petitioner began treatment with a psychiatrist who prescribed medication in an effort to treat the depression.  A few weeks later petitioner was treated at a hospital emergency room for a condition described as a "major depressive disorder--single episode".

The total cost for all of petitioner's psychological treatment amounted to approximately $5,000, a portion of which was paid under Winston's health insurance plan.  During the negotiations, petitioner did not inform the representatives who were negotiating on behalf of Winston, that he was receiving mental health treatment.

Other members of the Knoll family also received therapy treatment at the same time as petitioner.  Petitioner's son had suffered with a bipolar disorder for more than 15 years, and two of petitioner's daughters underwent therapy for problems relating

to a car accident.  In addition, Ms. King-Knoll received treatment to help her cope with the problems of other family members.

When negotiations began, petitioner was not aware of the tort of intentional infliction of emotional distress (IIED) or the tax benefits associated with that type of settlement. Several months after initiating counseling treatment, petitioner learned of the tax benefits for personal injuries from George Leonard, who, along with petitioner, was asked to resign on March 23, 1992.  Petitioner and Mr. Leonard coordinated their negotiation efforts with Winston by hiring the same attorney to represent them, and they regularly discussed the terms of their respective agreements.

Mr. Leonard supplied petitioner with language for a clause 2(b) specifying that payments received by petitioner were in satisfaction of personal injury claims.  Mr. Leonard also informed petitioner that Winston had readily agreed to allocate amounts toward personal injury claims for another partner who was being severed from Winston.  Approximately 1 month after being informed by Mr. Leonard about the personal injury information, petitioner proposed that a personal injury clause be inserted into the draft agreement.

It was not until summer 1993 and after petitioner learned of the tax benefits relating to personal injury settlements

(approximately 6 months after petitioner began psychological counseling) that he introduced a claim for personal injuries into the negotiations. On August 6, 1993, approximately 16 months after receiving the March 23, 1992, severance letter, petitioner proposed revision of clause 2(b) of Winston's June 22, 1993, draft agreement. The proposed revision contained only general references that the $55,000 lump-sum payment was for personal injury, as follows:

> in consideration of Mr. Knoll's release of defamation, intentional infliction of emotional distress, loss of personal reputation and other personal injury claims described in paragraph 1.n. of this Agreement.

Deborah Haude was the Winston attorney who was primarily responsible for negotiating settlement agreements with severed partners. Ms. Haude was experienced in employment torts, and during the course of the negotiations she also consulted with other Winston attorneys who specialized in taxation and employment torts. During a break in the August 6, 1993, meeting, Ms. King-Knoll spoke with Ms. Haude in the restroom. Ms. King-Knoll indicated to Ms. Haude that the extended negotiations and Winston's manner of negotiating was "destroying" petitioner.

Petitioner, however, did not make Ms. Haude and/or Winston aware of a specific tort claim, such as the IIED claim. Ms. Haude and other Winston negotiators knew that the negotiations caused petitioner stress; however, they did not know that he was receiving counseling treatment or know of his emergency room

visit. Petitioner did not specifically assert an individual personal injury claim during negotiations, and Winston did not attempt to verify any of the personal injury claims included in clause 2(b) of the final agreement.

The personal injury language was accepted by Winston, and substantially similar provisions were included in all successive draft agreements, as well as in the final agreement. This revised draft provided for approximately $165,000 in payments to petitioner.

Several additional revisions of the August 9, 1993, draft agreement occurred prior to the signing of the final agreement on December 22, 1994. Changes were made in each draft agreement as to the allocation of funds to a lump-sum and/or monthly bridging payments. However, the total amount of payments in every draft agreement (with one exception) and the final agreement was within $3,000 of the $165,000 original severance offer contained in the first draft agreement. The one exception involved a June 27, 1994, draft agreement providing for $117,833 in total payments. The $117,833 amount was an oversight which was corrected (increased to approximately $166,700) less than a week later.

In addition to reallocating the lump-sum and bridging payments, the amount to be allocated to the personal injury clause 2(b) was increased. An August 9, 1993, draft agreement contained a $55,000 allocation to settlement of personal injury

claims. The personal injury allocation increased to $94,500 in a June 27, 1994, draft agreement, $95,000 in a July 1, 1994, and succeeding draft agreements, and to $116,000 in the December 22, 1994, final agreement.

The final agreement provided for a lump-sum payment of $116,000 to be paid by December 29, 1994, (less $25,000 advanced to petitioner on December 19, 1994) and one payment of $3,333.33 to be paid on January 1, 1995. Petitioner's retirement date, per the final agreement, was February 1, 1995. In addition, the agreement did not require the repayment of the $48,420 advanced to petitioner prior to the final agreement. Ultimately, petitioner received $167,753.33 ($116,000.00, $48,420.00, and $3,333.33).

The final agreement, in pertinent part, contains the following personal injury clause:

> in consideration of Mr. Knoll's release of all claims for compensatory damages, defamation, intentional and negligent infliction of emotional distress, loss and diminishment of personal reputation and all other claims of personal injury, including, but not limited to those described in subparagraph n of paragraph 1 of this Agreement, the Firm will pay Mr. Knoll a lump sum payment in the amount of $116,000 * * * .

Subparagraph n of paragraph 1 of the final agreement was a general release, the language of which was substantially unchanged from the time of the first draft through the final agreement. In particular, the general release paragraph was not

changed even after petitioner had introduced the personal injury element into the negotiations.

During the audit examination, petitioner asserted, in a June 8, 1998, letter, that his settlement payment from Winston was for a release of his claims for IIED, defamation, and diminishment of personal reputation. Petitioner contended that the defamation and diminishment of personal reputation claim was based on certain improprieties of Winston's managing partner, at the time petitioner left the firm. The managing partner's improprieties were not discovered or made public until approximately 9 months after petitioner proposed the personal injury clause be added to the agreement. Petitioner did not raise a specific defamation and diminishment of personal reputation claim in negotiations with Winston and did not assert that position at trial.

Between June 12, 1992, and January 13, 1993, Winston made five separate payments to petitioner, which totaled $48,420.21. The payments were issued pursuant to petitioner's request and he used them to pay estimated State income tax bills and to make a Keogh plan contribution. Upon receiving each payment, petitioner signed documents confirming that he received an "advance" from Winston on each of the five respective dates. The signed documents also contained the condition that the advances would be recaptured from any lump-sum payment the firm might agree to give petitioner upon his transition from status as an active partner.

All of the payments were reflected in Forms K-1, Partner's Share of Income, Credits, Deductions, etc., as petitioner's share of the firm's annual partnership income.

Petitioner reported the receipt of the $48,420 on his 1993 Federal income tax return using Form 8082, Notice of Inconsistent Treatment or Amended Return. On the Form 8082, petitioner reported a difference of $48,420 from the amount reflected on his Form K-1 for Winston's tax year ending January 31, 1993, and the amount reported as income on his 1993 Federal tax return. Petitioner included, as an attachment to the Form 8082, a detailed explanation of the difference. The explanation reflected that petitioner was in the process of being severed as a partner from Winston and that the amount and character of his severance agreement were still in dispute. The explanation further reflected that the $48,420 in payments was not taxable income until the severance agreement and character of the payments were resolved.

Petitioner, using a Form 8082, reported the $48,420 as income on his 1995 Federal income tax return. He reflected a $48,240[5] difference from the amount shown as income on his Form K-1 from Winston, for its tax year ending January 31, 1995. Petitioner provided the explanation that the difference was due

_____

[5] Petitioner reported a $48,240 difference on Form 8082, Notice of Inconsistent Treatment or Amended Return; however, the amount of advances received by petitioner totaled $48,420.

to the fact that the payments were loans until the character of the payments was resolved on December 22, 1994.  Based on this theory, petitioner contended that the income was properly reported on petitioner's 1995 Federal income tax return because the resolution of its character occurred in Winston's fiscal year ended January 31, 1995.

OPINION

This controversy concerns the proper reporting of settlement payments received by petitioner in connection with his severance and/or being relieved from his position as a partner in a law firm.  Petitioner contends that the $116,000 was paid to him to settle a personal injury claim and is excludable from income under section 104(a)(2).  Respondent contends that the payment was in consideration of petitioner's severance from the law firm and not in settlement of a tort claim.

A second issue concerns whether payments totaling $48,420 received by petitioner prior to the final settlement were nontaxable loans or taxable advances.  Finally, we must decide whether petitioners are liable for an accuracy-related penalty under section 6662(a).

I.  Is The $116,000 Settlement Payment Excludable From Gross Income Under Section 104(a)?

A. General Rules

"[E]xcept as otherwise provided", gross income for the

purpose of calculating Federal income tax includes "all income from whatever source derived". Sec. 61(a). This definition is sweeping in scope and exclusions from income are to be narrowly construed. See <u>Commissioner v. Schleier</u>, 515 U.S. 323, 328 (1995). Further, "exemptions from taxation are not to be implied; they must be unambiguously proved."[6] <u>United States v. Wells Fargo Bank</u>, 485 U.S. 351, 354 (1988). The statute and regulations provide that compensation for services, including severance or termination pay, is expressly encompassed within the definition of gross income. See sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs.

Section 104 provides for an exclusion from gross income for certain payments received as compensation for injuries or sickness. Specifically, section 104[7] provides:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

\* \* \* \* \* \* \*

(2) the amount of any damages received (whether by

---

[6] No question has been raised with respect to the burden of proof or production under sec. 7491(a).

[7] The 1996 amendments added to sec. 104 by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1838, do not apply because the amendments are effective for amounts received after Aug. 20, 1996.

suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

The regulations under section 104 provide that the term "damages received (whether by suit or agreement)" means "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort-type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs.

In Commissioner v. Schleier, supra, the U.S. Supreme Court established a two-prong test for determining whether a taxpayer is eligible to exclude income under section 104(a)(2). The taxpayer must demonstrate (1) that the underlying cause of action giving rise to recovery is based upon tort or tort-type rights and (2) that the damages were received on account of personal injuries or sickness. See Commissioner v. Schleier, supra at 336-337.

B. Contentions of the Parties

Petitioner contends that the $116,000 payment he received from Winston was a result of arm's-length negotiations resulting in a settlement solely for his release of an IIED claim. Respondent contends that the $116,000 settlement payment was a portion of a severance payment, and not consideration for a release of a specific IIED claim.

C. Discussion

The first requirement for exclusion under section 104(a)(2) is that the claim underlying the settlement agreement must be based on tort or tort-type rights. Commissioner v. Schleier, supra. A tort is defined as a "'civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'" United States v. Burke, 504 U.S. 229, 234 (1992) (quoting Keeton et al., Prosser & Keeton on the Law of Torts 2 (1984)).

In the absence of a general Federal common law of torts or controlling definitions in the Internal Revenue Code, we look to State law to determine the nature of the claim litigated. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); United States v. Mitchell, 403 U.S. 190, 197 (1971). The claim must be bona fide, but it need not be sustainable or valid. See Stocks v. Commissioner, 98 T.C. 1, 10 (1992).

In Illinois, "Tort law * * * applies in situations where society recognizes a duty to exist wholly apart from any contractual undertaking." Collins v. Reynard, 607 N.E.2d 1185, 1186 (Ill. 1992). IIED has been recognized as a tort under Illinois law. See Valentino v. Hilquist, 785 N.E.2d 891, 903 (Ill. 2003). This Court has also recognized the infliction of emotional distress as a tortlike claim qualifying for exclusion

under section 104(a)(2). See <u>Bland v. Commissioner</u>, T.C. Memo.
2000-98.

In this case, petitioner contends that he suffered IIED due
to the conduct of Winston during negotiations. Specifically,
petitioner contends that Winston failed to return or delayed in
returning his telephone calls and refused to meet and negotiate
for substantial periods of time. Petitioner contends he became
distressed over this conduct and required psychological
treatment.

Petitioner's contention that he suffered from depression is
supported in the record.[8] The insertion of the personal injury
clause into the settlement agreement, however, was motivated
solely by tax considerations. Over the 32 months of
negotiations, Winston held firm to the original severance offer
of approximately $165,000. By attempting to characterize the
settlement as received for personal injury, petitioner aspired to
maximize his recovery by lessening or eliminating the tax burden.

---

[8] The record is not so clear, however, as to whether
petitioner's depression was causally linked to an IIED claim or
to the negotiation process with Winston. During the same period
as the negotiations with Winston, petitioner's son suffered from
a bipolar disorder, his daughters were undergoing therapy for
problems relating to a car accident, and his wife was receiving
treatment to help her cope with the problems of other family
members. It is difficult to discern a particular cause for
petitioner's depression, especially because it could have been,
in part or whole, attributable to natural depression that may
accompany a loss of employment after 26 years with the same firm.

On the other hand, Winston would be paying approximately the same amount that was originally offered to petitioner.

These circumstances call into question whether petitioner's IIED claim or Winston's agreement to characterize the settlement as for personal injury was bona fide. The terms of the settlement agreement were negotiated over a 2½-year period. Throughout that period, the total dollar amount being offered by Winston remained at approximately $165,000. It is significant that the personal injury clauses were included in proposed drafts of a settlement agreement substantially after negotiations began and that the $165,000 offer was not materially increased after the insertion of the personal injury claim or clause. The payment offers in the March 23 and April 15, 1992, letters, and the first four drafts of the settlement agreement characterized the settlement as being entirely in exchange for petitioner's severance from Winston. Up to that point, petitioner was unsuccessful in negotiating an increase in the amount of benefits for the severance. It was only after petitioner learned from George Leonard that settlement proceeds from personal injury claims could be excluded from taxable income that petitioner proposed recharacterizing a part of the settlement payment as being for personal injury.

Most significantly, the settlement amount received by petitioner was not increased for personal injury claims over and

above the amount originally offered as severance pay. It had become clear to petitioner that Winston would not increase the amount of its original offer approximating $165,000. Petitioner's motivation and purpose for proposing the personal injury clause was to increase the net amount of money he would realize from the settlement by attempting to reduce the tax burden on the amount being offered.

Equally significant is the fact that petitioner did not make Ms. Haude or any of the Winston representatives aware of his medical records or the details of any personal injury. Nor did petitioner attempt to show that Winston was the cause of any injury. Petitioner and Winston eventually agreed to include the personal injury clause and to assign an amount to it without addressing the merits of any such claim.

The following excerpt from Ms. Haude's testimony supports the above conclusion:

> beginning in summer of 1993 Ed was talking about tort damages and could we deliver some of the money tax-free. And we had extended conversations about whether, why, and what kind of money could be deliverable tax-free.

In reaching our conclusion, we also considered the fact that petitioner's bases for a personal injury claim were not specifically or adequately supported in the record. Petitioner contends that the $116,000 lump-sum settlement payment was solely for the release of his IIED claim. The final agreement between

petitioner and Winston, however, included a release for defamation and loss of personal reputation, negligent infliction of emotional distress, and other personal injuries.

Petitioner's bases for section 104 treatment, over time, have been inconsistent. In a June 8, 1998, letter to the Commissioner's examining agent, petitioner claimed that the cause of his defamation and diminishment of personal reputation claim was certain improprieties of Winston's managing partner at the time petitioner left the firm. That position changed for purposes of trial. In addition, the record reflects that the improprieties of Winston's managing partner were not disclosed until approximately 2 years after petitioner left Winston. During May 1994, Winston's managing partner resigned. Petitioner proposed defamation and loss of personal reputation as part of the personal injury clause on August 6, 1993. This was approximately 9 months before the former managing partner's improprieties were known to petitioner. Accordingly, his administrative position before the Internal Revenue Service (IRS) was an afterthought and lacked verity.

Even if we were to hold that petitioner's IIED tort claim was bona fide, it must also be shown that the settlement amount was paid "on account of personal injuries". Personal injuries that may be excluded from gross income under section 104(a)(2), can include harms that are tangible, intangible, physical and

nonphysical.  See Commissioner v. Schleier, 515 U.S. at 329 n.4.

Intangible harms include those affecting emotions, reputation, or

character.  See, e.g., Bland v. Commissioner, T.C. Memo. 2000-98.

Because IIED is an emotional injury, petitioner's claim is

personal in nature.

In addition to the nature of the injuries, entitlement to

section 104(a)(2) benefits depends on the purpose of the payment.

See Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121

F.3d 393 (8th Cir. 1997).  The critical question is:  "in lieu of

what was the settlement amount paid"?  Id.  Determining the

purpose or intent of a payment is a factual inquiry that takes

into account the terms of the agreement and the setting in which

it was reached and carried out.  See Stocks v. Commissioner, 98

T.C. at 11.  "If the payor's intent cannot be clearly discerned

from the settlement agreement, his or her intent must be

determined from all the facts and circumstances of the case in

issue there."  Robinson v. Commissioner, 102 T.C. 116, 127

(1994), affd. in part, revd. in part and remanded 70 F.3d 34 (5th

Cir. 1995).  An employer-payor's lack of knowledge about the

claimed personal injury is indicative that the payment was not

made on account of a personal injury.  See, e.g., Keel v.

Commissioner, T.C. Memo. 1997-278.

After a careful review of the record, we hold that Winston

did not intend to make the $116,000 settlement payment to

petitioner to release his IIED claim.  It is true that section 2(b) of the final agreement contains a reference to "intentional and negligent infliction of emotional distress".  That language is part of a more generalized form of release in exchange for the $116,000 payment.  In addition to the release of any claim for intentional and negligent infliction of emotional distress, Mr. Knoll also released any claim for compensatory damages, defamation, loss and diminishment of personal reputation, and all other claims of personal injury.  There is no specific allocation in the final agreement to petitioner's IIED claim.

Of greater significance is the fact that neither Ms. Haude nor Winston knew of any specific injury or claim by petitioner. Winston negotiators may have been aware that petitioner was experiencing stress in connection with his separation and the extended negotiations.  Ms. Haude was also advised by Ms. King-Knoll that Winston was "destroying" petitioner.  However, Ms. King-Knoll's comment was, at best, ambiguous and gave no specific indication that petitioner was experiencing psychological problems requiring treatment.  During the negotiations, petitioner did not assert a specific tort claim (including IIED) against Winston.  In connection with the negotiations and ultimate settlement, petitioner did not notify Winston or its representatives of the fact that he was receiving treatment for depression or of his emergency room visit, and Winston did not

initiate any factual inquiry as to the validity of an IIED claim. The record is silent about whether the parties negotiated the release of any specific tort claim.

It does not appear that there was a quid pro quo for release of any tort or personal injury claim. In addition, it does not appear that the parties engaged in good faith, adversarial, arm's-length negotiations relating to the personal injury clause. Winston was not motivated to resist the inclusion of a personal injury clause, and it had nothing to lose by agreeing to the clause. The clause did not obligate Winston to make additional monetary payments to petitioner in excess of the original offer. Before petitioner proposed the change to clause 2(b), personal injury claims were already included in the general release section of the draft agreement. In effect nothing changed other than Winston's agreement to some wording concerning personal injuries. Winston merely agreed to a more specifically worded personal injury release and to reallocate a portion of the same monetary payment that was on the table for more than 2 years. Winston did not admit any wrongdoing and was substantively in the same position it would have been if it did not agree to the change.[9]

---

[9] It is also likely that the changes in the final agreement were not intended to have any different effect on Winston's financial or tax reporting from those that would have resulted had petitioner accepted Winston's initial offers.

In summary, Winston agreed to change the form of its original severance offer to accommodate petitioner and facilitate a settlement after more than 2 years of protracted negotiations. The substance of the agreement, however, remained the same as that of the original severance offer. Accordingly, we hold that the $116,000 was not paid on account of personal injuries and is not excludable from petitioners' gross income under section 104. We hold further that the $116,000 was severance pay or compensation, and, therefore includable in petitioners' gross income.

D.  Year of Inclusion

Petitioner contends, in the alternative, that if the $116,000 is not excludable from income, the payments constitute his share of partnership income and should be included in income with respect to the 1995 fiscal year of the partnership, or for petitioner's 1995 tax year. See sec. 706(a). Respondent contends that the proceeds are severance payments and should be included in income for 1994, the year petitioner received the payment.

Under section 451(a) amounts received are included in gross income for the taxable year in which received by the taxpayer, unless it can be accounted for in a different period under an acceptable method of accounting. Sec. 451(a); see Keith v. Commissioner, 115 T.C. 605, 616 (2000).

We have held that the $116,000 in lump-sum payments was a severance payment to petitioner.  There is no evidence that a Form K-1 was issued by Winston with respect to the $116,000.  Indeed, petitioner and Winston attempted to treat the $116,000 as settlement of petitioner's personal injury claims. Petitioner was no longer an employee or partner of Winston.  The purpose of the negotiation was to effect the severance of petitioner's relationship from Winston, and the final settlement and payment were the culmination of the severance.  Moreover, the final settlement agreement and the $116,000 payment represented the final settlement of all of the parties' rights and obligations in the relationship and in no way were intended to represent petitioner's share of partnership income.  Accordingly, the receipt of both payments during December 1994 by petitioner, a cash basis taxpayer, results in income taxable in petitioner's 1994 tax year, and we so hold.

II.  Were Payments Totaling $48,420 Received by Petitioner Prior to The Final Settlement Nontaxable Loans or Taxable Advances?

Petitioner contends that five payments totaling $48,420 and received between June 1992 and January 1993 were loans from Winston.  His contention is based on the premise that he would have been required to repay the amounts received, if a settlement agreement had not been reached.  Petitioner also contends that if the advances are held to be income, they should not be considered

taxable income until the time the settlement agreement was reached and he was no longer obligated to repay them.  Respondent contends that the payments were not bona fide loans to petitioner because Winston did not intend to enforce the advances as loans. Therefore, the payments should have been included in petitioner's income for the tax year 1993.[10]

Gross income is "construed broadly to reach any accession to wealth realized by a taxpayer over which the taxpayer has 'complete dominion'".  Fla. Progress Corp. v. Commissioner, 114 T.C. 587, 598 (2000) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)).  Generally, the proceeds of a loan do not constitute income to the borrower because the benefit is offset by an obligation to repay.  See Arlen v. Commissioner, 48 T.C. 640, 648 (1967).  Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon consideration of all the pertinent facts in the case.  Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Birnbaum v. Commissioner, T.C. Memo. 1993-485.  For a disbursement to constitute a loan at the time funds are transferred, the recipient must intend to repay the proceeds and

---

[10] Respondent maintained alternative protective positions in the notices of deficiency by determining deficiencies attributable to the $48,420 in the 1993 and 1994 tax years. Petitioner did not report the amount until the 1995 year, when the entire matter was completely settled.  The parties, in their arguments on brief, frame the ultimate question in terms of whether the $48,420 is reportable in 1993 or 1995.

the lender must intend to enforce repayment.  See <u>Haag v.</u>
<u>Commissioner</u>, 88 T.C. 604, 615 (1987), affd. without published
opinion 855 F.2d 855 (8th Cir. 1988).

The record reflects that Winston did not intend to enforce
repayment of the advances made to petitioner.  The most
compelling indication of this fact is that Winston included the
full amount of the advances in petitioner's Form K-1 for the
partnership's tax year ending January 31, 1993.  Winston also
refused Mr. Knoll's request to recharacterize the payments as a
loan or as a payment for a release of a tort-type personal injury
claim.  In addition, section 2(f) of the final settlement
agreement allocates the $48,420 of payments as in satisfaction of
items including "salary, draw, guarantee, bonus * * * partnership
income or profits, fees, fee participation".  These facts do not
support characterizing the proceeds as a loan.

Other facts add additional support for the conclusion that
Winston did not intend the advances to be loans.  Petitioner
signed acknowledgments of receipt each time he received a payment
from Winston.  Notably, the forms did not include terms of
repayment, did not require petitioner to pay interest, and did
not require petitioner to pledge collateral.  While the
acknowledgments stated that each payment would be recaptured from
any lump-sum payment the firm may agree to pay petitioner, in
light of other more compelling evidence, this fact is not

sufficient to characterize the advances as loans.  There were no restrictions or conditions precedent to petitioner's use of the advances.  Further, upon receipt, petitioner had dominion over and an unfettered right to use the advances.

Accordingly, we hold that the aggregate advance payments of $48,420 were reportable as taxable income in petitioner's 1993 tax year.

III.  <u>Are Petitioners Liable for Penalties Under Section 6662(a) for Substantial Understatement of Tax or The Negligent Disregard of The Rules and Regulations?</u>

Section 6662 provides for a 20-percent penalty on any understatement of tax attributable to negligence or disregard of the rules or regulations, or any substantial understatement of income tax.[11]  Pursuant to section 6662(c), negligence includes any failure to make a reasonable attempt to comply with the Internal Revenue Code including a careless, reckless, or intentional disregard of the Code.  A substantial understatement of tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  If an understatement exists, it may be reduced by the portion of the understatement for which the taxpayer had substantial authority, or the amount for which the taxpayer disclosed relevant facts and had a

_____

[11] As previously noted, no question has been raised with respect to the burden of proof or production under sec. 7491.

reasonable basis to support the tax treatment.  Sec. 6662(d)(2)(B).

For the purposes of this section, a taxpayer is negligent when he or she fails "to do what a reasonable and ordinarily prudent person would do under the circumstances."  Korshin v. Commissioner, 91 F.3d 670, 672 (4th Cir. 1996), affg. T.C. Memo. 1995-46.  Whether a taxpayer acted with reasonable cause and good faith is measured by examining the relevant facts and circumstances, and most importantly, the extent to which he attempted to assess his proper tax liability.  See Neely v. Commissioner, 85 T.C. 934 (1985); Stubblefield v. Commissioner, T.C. Memo. 1996-537; sec. 1.6664-4(b)(1), Income Tax Regs.

The record we consider reflects that petitioner did not reasonably attempt to properly assess his income tax liability with respect to the $116,000 received from Winston.  The notes taken by petitioner during the negotiations with Winston and his trial testimony both reveal that he knew which tort claims were and were not taxable.  Petitioner's revision of the settlement payment allocations toward the release of several tort claims was motivated by the need to lessen his tax burden and not because of any specific tort claim.  The settlement agreement and release contain several tort claims with no specific allocation.  Years later, at trial, petitioner attempted to narrow the list to those tort claims that he might have a chance to substantiate.

Petitioner also took a position at trial inconsistent with the position he asserted with the IRS auditor. Petitioner asserted to the Commissioner's examining agent that he was compensated for claims of defamation and loss of personal reputation and IIED. Petitioner then abandoned the defamation and loss of personal reputation claim at trial because he did not have a valid argument supporting the claim. Petitioner is a lawyer with experience in tax-advantaged financing. He negotiated and structured the settlement agreement to secure tax advantages that he knew were valid in form only and not in substance.

Conversely, petitioner disclosed relevant facts and had a reasonable basis to support his tax treatment of the $48,420 in advances he received from Winston. Petitioner disclosed on his 1993 tax return the difference between the amount that appeared on his Form K-1 and the amount that he reported. He also provided a detailed explanation for this treatment. Further, based on the acknowledgments he signed, petitioner could have reasonably concluded that he would be obligated to repay the advances if a settlement agreement had not been reached. Accordingly, we hold that petitioner is subject to the accuracy-related penalty under section 6662(a) for his treatment of the $116,000 in lump-sum payments, but not subject to a penalty for his treatment of the $48,420 in advance payments.

To reflect the foregoing,

Decisions will be entered

under Rule 155.