T.C. Memo. 2007-278


UNITED STATES TAX COURT


ESTATE OF CHARLES WHITTAKER WRIGHT, DECEASED,
VALERIE WRIGHT-BALLIN, ADMINISTRATRIX, AND BETTY J. WRIGHT,
DECEASED, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 173-97.          Filed September 13, 2007.


Gary H. Kuwada and Steve Mather, for petitioners.

Wesley J. Wong, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Respondent determined a deficiency in income tax of $413,369 against petitioners for the tax year 1992, based on respondent's position that Charles Whitaker Wright and Betty J. Wright (hereinafter petitioners) erroneously excluded from gross income settlement proceeds of $1,269,950 pursuant to

section 104(a)(2).[1]  We find that respondent's determination was in error regarding $1,257,500 of the amount in dispute.

## FINDINGS OF FACT

Petitioners were married and filed a joint Federal income tax return for 1992.  Respondent issued a notice of deficiency to petitioners on October 10, 1996.  Petitioners timely petitioned this Court.  At the time they filed the petition, petitioners resided in Los Angeles, California.

Mr. Wright died on January 1, 1999, at the age of 78.  Mrs. Wright had died on January 1, 1998.  Their daughter was appointed as the administratrix of her parents' estates by the Superior Court of California for the County of Los Angeles.

In the mid-1960s, Mr. Wright organized Marvin Engineering Co., Inc. (MEC), a California corporation, with Marvin Gussman and Gerald Friedman.  MEC's primary business was making parts for the aerospace and defense industries.  Mr. Gussman served as the president and chief executive officer, and Mr. Friedman served as the chief financial officer.  Mr. Wright was an engineer for MEC and worked in production and the development of new products.  Mr. Wright was also a director of MEC.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In 1988, Mr. Wright decided he wanted to leave MEC. A dispute arose because Mr. Wright believed that he owned 40 percent of the outstanding shares of MEC, while Mr. Gussman and Mr. Friedman believed he owned only 10 percent. Mr. Wright also believed that MEC had paid Mr. Gussman and Mr. Friedman disproportionately larger bonuses than it had paid him. The corporate records of MEC reflect that Mr. Wright was a 10-percent shareholder, because he owned 40 shares of MEC's 400 outstanding shares of common stock. Mr. Wright was emotionally distraught by the discrepency between his understanding and the corporate records.

Mr. Wright engaged the law firm of Paul, Hastings, Janofsky & Walker (Paul, Hastings) and began a lengthy effort to extract a resolution from MEC and the other shareholders that would provide a significant payment to him. Tolliver Besson and John Burns of Paul, Hastings represented Mr. Wright in negotiating with MEC and the other shareholders.

By October 1990, Mr. Burns was engaged in settlement negotiations on behalf of Mr. Wright. Mr. Burns prepared two draft agreements as part of the negotiations. The first was dated October 26, 1990. It outlined a settlement including a $7 million stock buyout and a payment of $1 million for emotional distress. It did not contain any reference to the underpayment of compensation. The second draft agreement was dated January

22, 1991. It was similar to the first, but it provided different terms regarding the timing of the payments. When these proposals proved unsuccessful, Mr. Besson took over control of the negotiations in April 1991. He directed that a memorandum be prepared by other lawyers at Paul, Hastings. This memorandum discussed 10 potential causes of action that Mr. Wright might have against Mr. Gussman and Mr. Friedman, including a claim for intentional infliction of emotional distress. Regarding the intentional infliction of emotional distress, the memorandum included the following:

> At a minimum, as a result of Messrs. Gussman's and Friedman's fraudulent, wrongful actions and self-dealing, and refusal to permit Mr. Wright to inspect the books and records of MEI [sic], Mr. Wright has suffered substantial emotional distress.

The memorandum further stated that a claim for intentional infliction of emotional distress might be unlikely to result in damages in litigation unless fraud by the other former shareholders was established.

A subsequent draft memorandum of agreement was dated July 1991. This draft treated in greater detail certain intellectual property that Mr. Wright sought to have assigned to him, Mr. Wright's employment with MEC, and other matters. It provided for $2 million in settlement of claims for personal injury. Like the prior draft agreements, it was never finalized.

In negotiations, it appeared the other shareholders were intentionally delaying to force Mr. Wright to capitulate because of legal costs. Mr. Besson observed that the stress of the dispute was affecting Mr. Wright physically. Mr. Wright's dilemma was that bringing suit would be even more expensive for him although bringing suit appeared to be the only means likely to force a settlement. In a letter to Mr. Wright dated May 1, 1991, Mr. Besson discussed the likelihood of forcing a settlement short of litigation.

In June 1991, a draft complaint was prepared. This complaint included a cause of action for the intentional infliction of emotional distress. A complaint was never filed because Mr. Besson and Mr. Friedman negotiated an agreement on behalf of Mr. Wright, MEC, and the other shareholders. This agreement was documented in a Memorandum of Agreement dated May 15, 1992, but not finalized until July 29, 1992. Each item of payment in this agreement was negotiated separately. In addition to the Memorandum of Agreement, other documents were executed as a part of the settlement. These included a General Release Agreement, an Option Agreement, a Consent of Spouse, a Bill of Sale, Payment Instructions and Termination of Escrow, Mr. Wright's resignation of office in MEC, and a receipt in which Mr. Wright acknowledged receipt of $952,883.37 in January 1992 and

$262,000 in 1991 in settlement of claims for personal injuries suffered by Mr. Wright and his spouse.

The Memorandum of Agreement provided that: (1) MEC would receive an option to purchase all of Mr. Wright's shares for $2.5 million if exercised before August 1, 1996, or $2.6 million if exercised before August 1, 1997; (2) Mr. Wright would receive $1 million in revenue bonds for settlement of compensation claims; (3) Mr. Wright would receive $1,038,000 in cash for personal injuries he and his spouse suffered in addition to $262,000 which he had received in 1991; and (4) the titles to three automobiles would be transferred to Mr. Wright.

For 1992, MEC issued a Form 1099-MISC, Miscellaneous Income, to Mr. Wright showing nonemployee compensation of $1,257,500 and a Form W-2, Wage and Tax Statement, showing wages of $1,042,400. There are discrepancies among the agreement, the cash receipt, and the Form 1099-MISC regarding the amount for personal injuries.

In the notice of deficiency for 1992, respondent determined increased taxable income of $1,269,950 and adjusted itemized deductions. The adjustments to itemized deductions are purely computational and depend on the primary adjustment. The $1,269,950 amount is consistent with the Form 1099-MISC, plus the total value of $12,450 stated on the Bill of Sale transferring the three automobiles from MEC to Mr. Wright. Although

$1,257,500 does not coincide with any of the settlement documents in the record as noted above, petitioners have not contested that this is the amount paid for personal injuries. The transfers of the automobiles are not stated in the Memorandum of Agreement to be part of the personal injury settlement; rather, they are separately listed in that document.

OPINION

The controversy concerns whether petitioners may exclude from gross income under section 104(a)(2) a portion of the settlement proceeds they received from MEC, a corporation of which Mr. Wright was one of the founding shareholders and a long-term employee.

## I. General Rules

"Except as otherwise provided", gross income for the purpose of calculating Federal income tax includes "all income from whatever source derived". Sec. 61(a). This definition is sweeping in scope, and exclusions from income are to be narrowly construed. See Commissioner v. Schleier, 515 U.S. 323, 328 (1995). Further, "exemptions from taxation are not to be implied; they must be unambiguously proved."[2] United States v. Wells Fargo Bank, 485 U.S. 351, 354 (1988). The statute and the regulations provide that compensation for services, including

---

[2]No question has been raised with respect to the burden of proof or production under sec. 7491(a).

severance or termination pay, is expressly encompassed within the definition of gross income.  See sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs.

Section 104 provides for an exclusion from gross income for certain payments received as compensation for injuries or sickness.  Specifically, section 104(a)[3] provides in part:

> SEC. 104.  COMPENSATION FOR INJURIES OR SICKNESS.
>
> (a)  In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--
>
> \*      \*      \*      \*      \*      \*      \*
>
> (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

The regulations under section 104 provide that the term "damages received (whether by suit or agreement)" means "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."  Sec. 1.104-1(c), Income Tax Regs.

---

[3]The 1996 amendments to sec. 104 by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605, 110 Stat. 1838, do not apply because the amendments are effective for amounts received after Aug. 20, 1996.

In Commissioner v. Schleier, supra, the U.S. Supreme Court established a two-prong test for determining whether a taxpayer is eligible to exclude income under section 104(a)(2). The taxpayer must demonstrate (1) that the underlying cause of action giving rise to recovery is based upon tort or tort-type rights, and (2) that the damages were received on account of personal injuries or sickness. Id. at 336-337.

Where amounts are received pursuant to a settlement agreement, the nature of the claim underlying the damage award, rather than the validity of the claim, determines whether damages are excluded under section 104(a)(2). United States v. Burke, 504 U.S. 229, 237 (1992). The nature of the claim is generally ascertained by considering the facts and circumstances surrounding the settlement agreement. Knoll v. Commissioner, T.C. Memo. 2003-277.

II. Contentions of the Parties

Petitioners contend that the settlement documents reflecting arm's-length negotiations and the separately negotiated payments speak for themselves as to their purpose. In other words, a portion of the settlement was earmarked for personal injuries as had been negotiated from the outset, and this payment was intended for that purpose by the payors. Petitioners also maintain that intentional infliction of emotional distress is a tort or tort-like claim, citing United States v. Burke, supra at

234, and California law.  Finally, petitioners assert that the portion of the settlement in dispute was paid for personal injuries or sickness as reflected in the settlement agreement. Respondent does not contest that under California law intentional infliction of emotional distress is a tort for purposes of United States v. Burke, supra.  Rather, respondent maintains that the settlement agreement is not reflective of the true intent behind the payment.  Respondent asserts that this was a business dispute and that under California law a claim for intentional infliction of emotional distress could never have been sustained in litigation.  Therefore, respondent reasons that personal injury was not the motivation for any portion of the payments to Mr. Wright.

III.  Analysis

It would have been difficult to sustain a cause of action for the intentional infliction of emotional distress; however, the same could be said for the assertion of 40-percent ownership by Mr. Wright's counsel in the negotiations which led to the settlement in question.  There is also little direct evidence of physical harm to Mr. Wright.  It is uncontested that he suffered severe emotional distress as a result of the shock of learning that his longstanding business partners rejected his deeply held belief that he was the 40-percent owner of MEC, but he rejected advice to see a physician.  Regardless, under the law controlling

in 1992, it is not necessary for petitioners to establish physical harm. Rather, it is the intent of MEC in making the payment that controls in this situation.

There are several facts which cause us to find that the intent in this case is consistent with the terms of the settlement agreement. First, the record establishes that amounts for three key causes of action were each separately negotiated. Second, a significant portion of the settlement was paid for undercompensation and most of it for the option to buy Mr. Wright's stock. This is not a case where the entire settlement amount was recharacterized at a late point in negotiations to achieve a favorable tax result for the payee. Cf. Knoll v. Commissioner, supra. A claim for emotional distress was a part of the negotiation throughout. Third, Mr. Wright was actually emotionally distressed because of the position taken by his fellow shareholders and his belief that he was being defrauded. Had his counsel been able to establish fraud in litigation against MEC's other shareholders, it is plausible that Mr. Wright would have had a recovery for the intentional infliction of emotional distress. Given these circumstances, the record simply does not support ignoring the negotiated agreement which is the basis for the distinct types of payments to Mr. Wright.

Thus, because the Memorandum of Agreement did not designate the transfer of the automobiles as part of the consideration for

the emotional distress claim, we find that $12,450 of the amount

in dispute is not excludable under section 104(a)(2).  We do,

however, hold that $1,257,500 is so excludable.

　　　To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.