# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Toftoy v. Rosenwinkel*, 2011 IL App (2d) 100565

---

| | |
|---|---|
| Appellate Court Caption | ROGER TOFTOY and BOBBIE TOFTOY, Individually and as Parents of Natalie Toftoy and Haylie Toftoy, Plaintiffs-Appellees, v. KEN ROSENWINKEL and ROSENWINKEL FAMILY PARTNERSHIP, L.L.C., Defendants-Appellants. |
| District & No. | Second District<br>Docket No. 2-10-0565 |
| Filed | November 17, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the injunction entered against defendants ordering them to take certain measures to prevent excessive flies from emanating from defendant's cattle operation, the trial court did not err in finding that the Farm Nuisance Suit Act did not bar plaintiffs' suit, and the findings that the fly invasion from defendants' property was substantial and unreasonable were not against the manifest weight of the evidence, but the injunctive relief granted by the trial court was vacated on the ground that it was vague and overly broad, and in the absence of a request that the cause be remanded for a hearing so that a proper injunction could be entered, no remand was ordered. |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 07-CH-418; the Hon. Linda S. Abrahamson, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

| Counsel on<br>Appeal | Kevin Quinn Butler and Cornelius E. McKnight, both of McKnight, Kitzinger, McCarthy & Pravdic, LLC, of Chicago, for appellants. |
| | Frederick E. Roth, of Naperville, for appellees. |

Panel
PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justice Hudson concurred in the judgment and opinion.

Justice Hutchinson specially concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    Plaintiffs, Roger and Bobbie Toftoy, sought a declaratory judgment and injunctive relief against defendants, Ken Rosenwinkel and Rosenwinkel Family Partnership, L.L.C., alleging that defendants' cattle operation created a nuisance as a result of excessive flies emanating from the farm and coming onto their property. The trial court denied defendants' motions for summary judgment and for a directed finding. Following a bench trial, the trial court entered an injunction against defendants, ordering them to take certain measures to prevent excessive flies from emanating from their cattle operation. Defendants appeal, arguing that the trial court erred in: (1) denying their motions for summary judgment and for a directed finding, where it found that the Farm Nuisance Suit Act (Act) (740 ILCS 70/1 *et seq.* (West 2006)) did not bar plaintiffs' suit; (2) finding that the flies constituted a nuisance; and (3) granting plaintiffs injunctive relief. For the following reasons, we affirm in part and vacate in part.

¶ 2                            I. BACKGROUND

¶ 3    In March 1991, defendants purchased 160 acres of farmland on Hollenback Road in Newark with the intention of running a cattle operation thereon. The land had previously been used as a cattle farm. In 1992, defendants started their cattle operation on the property, purchasing 10 cattle at that time.

¶ 4    Plaintiffs own a parcel of land across the street from and to the west of defendants' farm. Their parcel was formerly part of a larger parcel owned by Clarence Toftoy (Roger Toftoy's father and not a party to this case), who purchased it in 1967. When defendants purchased their property, Clarence owned a 200-acre parcel of farmland across the street. Clarence had used the land for agricultural purposes. A nineteenth century farmhouse on Clarence's property was occupied by a tenant, Debbie Slatton, and her family from 1986 until December 1991 (Clarence never lived in the house). In 1989, plaintiffs began using the barn and fenced

lots on Clarence's property to board horses. The old farmhouse was vacant from January 1992 to 1997. In 1998, Clarence gifted (by deed) 1.83 acres of his property, which included the old farmhouse, to plaintiffs. Prior to the transfer of ownership, Clarence demolished the old farmhouse and in 1997 plaintiffs began building in the same location a new house to be used as their primary residence. (Plaintiffs obtained a building permit in October 1997.) In 2002, Clarence gifted to plaintiffs an additional 58 acres of adjacent farmland.[1] Plaintiffs completed construction of and moved into their residence in 2004.

¶ 5    In 2007, plaintiffs sued defendants, alleging that excessive flies emanated from defendants' farm and that the excessive flies constituted a nuisance. They further asserted that the cattle operation could be modified to prevent excessive flies. This could be accomplished by implementing proper cattle-manure-handling procedures and limiting the number of cows and calves present on the farm. Plaintiffs asked the court to declare the fly invasion to be a nuisance and to order defendants to implement reasonable fly-prevention measures, or, alternatively, to enjoin defendants from using the farm as a cattle operation. In response, defendants denied plaintiffs' substantive allegations and raised the affirmative defenses that they had immunity under the Act and that the alleged nuisance was caused by plaintiffs' negligence and conditions outside of defendants' control.

¶ 6    On November 4, 2009, defendants moved for summary judgment, arguing, *inter alia*, that plaintiffs' suit was barred by the Act or, alternatively, that the record contained no evidence that the alleged nuisance was substantial. The trial court denied defendants' motion. The court found that plaintiffs were not the legal owners of the old farmhouse, but that the farmhouse existed when defendants commenced their cattle operation. The court also found that the cattle operation predated: the demolition of the old farmhouse, the subdivision of the 1.83-acre parcel and its conveyance to plaintiffs, the construction of plaintiffs' home, and plaintiffs' move into their home. As to the Act, the court found that the demolition, subdivision, conveyance, construction, and move did not constitute changed conditions as contemplated thereunder. The court also rejected defendants' argument that there was no factual issue as to whether the nuisance was substantial.

¶ 7    A bench trial commenced on January 11, 2010. Roger Toftoy, a heavy-equipment operator and farmer, testified that he and his family moved into their newly built house in 2004, at which point defendants' cattle operation had been in place for more than one year. He conceded that, when defendants purchased their farm, plaintiffs did not own the property where they currently live. Between 1992 and 1998, plaintiffs did not own any land on Hollenback Road and no one lived on the 1.83-acre parcel.

¶ 8    Roger had helped farm Clarence's land since 1967; however, he did not grow up on a farm. Plaintiffs considered remodeling the old farmhouse but decided that it would not be cost effective to do so. Addressing the fly invasion, Roger testified that, during "fly season" (May until the first hard frost or November), the flies were very bothersome outside plaintiffs' home. It was difficult for the children to play outside; they played inside the home

_____

[1]Both the 1.83-acre and 58-acre parcels are zoned for agricultural use. However, the 1.83-acre parcel is not taxed as farmland.

and wore long pants outside to avoid fly bites.

¶ 9 Plaintiffs had kept horses on their/Clarence's property since 1989. The fly invasion affected the horses. It became difficult for plaintiffs to use or train their horses, because the horses could not stand still when being attacked by flies. Beginning in 2008, Roger experienced "less flies" on his property and the flies were not bothersome every day.

¶ 10 Ken Rosenwinkel testified as an adverse witness. Rosenwinkel did not live at the cattle operation. He did not have a written manure-management plan or a fly- or pest-management program for his cattle operation. He never consulted an entomologist to develop such programs, because state law did not require him to do so. Rosenwinkel further testified that he hired a veterinarian to assist him in raising cattle, including the management of flies and other pests. Although he did not have a written manure-management procedure, he did follow a procedure that involved spreading manure in the field and working it into the soil. He also periodically sprayed with insecticides, inspected for breeding sites, and used fly tags that contain pesticide. Also, he used fly-control additive in the cattle feed.

¶ 11 Rosenwinkel conceded that, when he purchased his property, there was a house on plaintiff's property, occupied by Slatton and her family, and that the only change that had occurred on the property since then was the demolition of the old house and the construction of the new house at the same location, with plaintiffs residing in the new house. Also, when Rosenwinkel purchased his property, there were no cattle on it (as his operation began in 1992).

¶ 12 Bobbie Toftoy testified that her family acquired their property in 1998 and that no one lived on Clarence's/plaintiffs' property between 1992 and November 2004. Defendants' farm had been in operation for more than one year before her family came to own the property where they now resided. Bobbie had two horses on their property; she had used the barn on the property to pen horses before 1992. Bobbie did not have a written manure-management plan for her horses, because plaintiffs' farm did not "have flies."

¶ 13 Beginning in mid-June 2007, plaintiffs' property had "swarms" of flies on the house, including the gutters, siding, windows, garage doors, and transformer boxes. There was a fly about every inch or half inch. On Father's Day 2007, Bobbie saw Roger in the front yard and the entire back of his shirt was "covered solid with flies." There were times when Bobbie could not put her horses on the turnout because the horses were too bothered by the flies. She applied a fly wipe on the horses that allowed them to go out for two hours; Bobbie would have to wipe down "every inch of their bod[ies]" with the treatment. She could not put the children on the horses. Bobbie further testified that plaintiffs could not use their porch because it had too many flies and was marked up. The children did not like to play outside, because the flies would bite. Plaintiffs avoided opening their garage doors; Roger would wait until dark to pull his car into the garage. Plaintiffs did not have people over and tried not to use their outdoor space.

¶ 14 Ralph Williams, an entomologist, testified as an expert witness. In 2007, he was contacted by Bobbie, who wanted his input concerning an excessive fly problem from defendants' farm. After inspecting plaintiffs' farm, Williams concluded that the flies did not originate there and that the "most obvious" location from which the flies originated was

defendants' cattle operation. Williams observed fly specks on the exterior of plaintiffs' home. He testified that most of the specks were on the home's east side, which is the side facing defendants' cattle barn.

¶ 15 Williams inspected defendants' farm in August 2008. He walked through barn areas and looked at sites where stable flies, which are blood-sucking flies, potentially would be found breeding, such as water tanks and stored hay. He testified that, based on his inspections, he believed that "the primary source of stable flies [was] from [defendants'] property." Williams stated that defendants could prevent stable flies by eliminating breeding sites or with proper waste management, which would include using insecticides. Williams found no violations of the standard of care in cattle operation.[2] He stated that stable-fly breeding sites are found in manure and decomposing vegetation. Stable flies usually travel only one-fourth to one-half mile from their preferred breeding sites. One trap he set at plaintiffs' property trapped 1,800 flies within 24 hours.

¶ 16 Williams further testified that you cannot "have 100 percent elimination of flies where you have livestock." However, even in an agricultural area, he would not expect over 5,700 stable flies to be collected in a fly trap in one week (as was done at plaintiffs' property). In Williams' view, that number is excessive. Williams also testified that research studies show that 20 or more stable flies per cow are a nuisance to the animal. They cause irritation and "contribute to weight gain losses and reduction in milk production."

¶ 17 On cross-examination, Williams conceded that, when he initially inspected plaintiffs' property, he did not inspect other potential sources of stable flies on surrounding properties or assess whether cattle were raised on other farms in the area. Williams further acknowledged that he did not inspect every aspect of plaintiffs' property and that he concluded that flies were emanating from defendants' cattle operation before he inspected defendants' property.

¶ 18 Todd Ayers, who was employed by defendants to manage their cattle operation and help with other activities, testified as an adverse witness. Ayers stated that he was responsible for pest control on defendants' farm and that defendants had no written pest-control program. However, they had an unwritten program, which included scraping manure, incorporating manure into nearby fields, pouring chemicals on animals, and using insecticides, oilers, fly tags, and cattle-feed supplements. Every day, Ayers visually inspected defendants' property for stable-fly breeding locations. Viewing two exhibits consisting of photographs taken by Williams of stable-fly breeding sites on defendants' property, Ayers testified that the sites were unacceptable and that, if he had observed them, he would have "cleaned [them] up."

¶ 19 Ayers further testified that, in 2007 and 2008, he did not observe that the cattle on defendants' property were uncomfortable or unhealthy. Almost daily during the summer of 2007, Ayers observed plaintiffs working outside their house. Bobbie was typically dressed in long pants. Ayers also observed the children playing in the backyard or driving their golf cart. He also observed Bobbie's horses outside "most days." Flies were never bothersome

_____

[2]Pursuant to a motion *in limine*, the trial court barred testimony concerning defendants' alleged negligence in the operation of their cattle farm.

at defendants' property.

¶ 20    Plaintiffs rested, and defendants moved for a directed finding. The trial court denied the motion.

¶ 21    Thomas McKenna, a veterinarian, testified on defendants' behalf. In 2002, defendants hired him to consult and provide veterinary services. McKenna testified that defendants used the most up-to-date technology for pests and took additional measures to prevent them, including limiting animal confinement, using feed bunks and silage bags, and testing soil to determine where manure needed to be spread. In McKenna's view, defendants operated a "good clean outfit." However, he never inspected the property for stable-fly breeding sites.

¶ 22    Rosenwinkel testified that he owned 160 acres and that he bought the property because it was well suited for his cattle operation. He purchased different types of minerals and fly-control additives.

¶ 23    On February 17, 2010, the trial court entered a declaratory judgment in plaintiffs' favor, finding that, although there were changes to plaintiffs' property–namely, the old farmhouse was demolished and a new home was built in its place–those changes did not constitute "changed conditions" as contemplated by the Act. The court noted that plaintiffs' home was not a business such as a bed and breakfast. "There is a house where there was a house. There is now a family where there once was a family." The trial court further found that plaintiffs proved that defendants' farm was the source of stable flies on plaintiffs' property and that the fly invasion constituted a substantial annoyance to a reasonable person. The court also determined that defendants had knowledge that plaintiffs were alleging harm to their interests in their property and that the invasion was unreasonable and that it would have been practical for defendants to reduce the number of flies emanating from their farm. After the court entered judgment in plaintiffs' favor it stated that it wanted to hear additional evidence concerning the request for injunctive relief. Defendants objected, noting that the evidence was closed and arguing that no evidence was offered concerning potential solutions. The court then stated that it "could probably grant some injunctive relief."

¶ 24    The injunction order was entered on April 30, 2010. The court ordered that, from May 1 until November 1, defendants conduct weekly visual inspections of their cattle-confinement and hay-bale-storage areas and remove all active and potential breeding sites (including bedding and manure from the cattle-confinement and hay-storage areas and with attention to areas around feeders, tanks, hay bales, fences, gates, and "all other areas inaccessible to machine scraping"). The court also ordered that, on a monthly basis from June 1 until October 1, defendants (at their own expense) have the cattle-confinement and hay-bale-storage areas professionally inspected for potential and active breeding sites. The court further ordered that the inspector prepare a written report of his or her findings within 10 days of the inspection and provide copies to plaintiffs and the court. The court also ordered that, for the year 2010, upon a finding of active sites, defendants direct the inspector to prepare a written plan to eliminate active and potential sites; in the event of no discovery of active sites in 2010, inspections could occur every 60 days. The court also ordered that, after 2010, defendants have a continuing obligation to maintain their operation free from active and potential stable-fly breeding sites, and it retained jurisdiction for enforcement purposes.

Defendants appeal.

¶ 25                                II. ANALYSIS

¶ 26                          A. Farm Nuisance Suit Act

¶ 27    Defendants argue first that the trial court erred in denying their summary judgment motion and subsequent motion for a directed finding. They contend that the changes on plaintiffs' property constitute changed conditions as contemplated by the Act. For the following reasons, we disagree.

¶ 28    Generally, the denial of "a motion for summary judgment is not reviewable following an evidentiary trial, because the result of any error in such denial is merged by law in the subsequent trial." *Valentino v. Hilquist*, 337 Ill. App. 3d 461, 467 (2003). However, where the fact finder did not assess the issues addressed in the motion, "any error in the denial of summary judgment based on these issues was not merged in the subsequent trial." *Id.*; see also *Battles v. La Salle National Bank*, 240 Ill. App. 3d 550, 558 (1992) (where a summary judgment motion presented a legal issue rather than a factual one, review of the denial of summary judgment is appropriate). We review *de novo* the denial of a motion for summary judgment and a motion for a directed finding or verdict. *Valentino*, 337 Ill. App. 3d at 468 (summary judgment); *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167 (2003) (directed verdict).

¶ 29    The first issue presents a statutory interpretation question, which is a question of law we review *de novo*. *Hossfeld v. Illinois State Board of Elections*, 238 Ill. 2d 418, 423 (2010). When interpreting a statute, our primary goal is to ascertain and give effect to the legislature's intent, and the most reliable indication of the legislature's intent is the plain language of the statute. *Metzger v. DaRosa*, 209 Ill. 2d 30, 34-35 (2004). Where the language is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009).

¶ 30    The Act is a right-to-farm statute. Such statutes were enacted as a response to the urbanization of agricultural lands and they seek to protect agricultural producers and operations from nuisance actions. Harrison M. Pittman, Annotation, *Validity, Construction, and Application of Right-to-Farm Acts*, 8 A.L.R.6th 465 (2005); see also Margaret Rosso Grossman & Thomas G. Fischer, *Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer*, 1983 Wis. L. Rev. 95, 98 (these enactments attempt to prevent a "pig from becoming a nuisance merely because someone has built a parlor near the barnyard").

¶ 31    The Act states:

     "§ 1. It is the declared policy of the [S]tate to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. When nonagricultural land uses extend into agricultural areas, farms often become the subject of nuisance suits. As a result, farms are sometimes forced to cease operations. Many others are discouraged from making investments in farm improvements. It is the purpose of this Act to reduce the loss to the State of its agricultural resources by limiting the circumstances under which farming operations may

-7-

be deemed to be a nuisance." 740 ILCS 70/1 (West 2006).

The Act defines a "farm" as "any parcel of land used for the growing and harvesting of crops; for the feeding, breeding and management of livestock; for dairying or for any other agricultural or horticultural use or combination thereof." 740 ILCS 70/2 (West 2006).

¶ 32     Section 3 of the Act provides farmers immunity from nuisance suits in cases of changed conditions (with the exception of cases of negligent or improper operation). It provides:

"§ 3. No farm or any of its appurtenances *shall be or become a private or public nuisance because of any changed conditions* in the surrounding area occurring after the farm has been in operation for more than one year, when such farm was not a nuisance at the time it began operation, provided, that the provisions of this Section shall not apply whenever a nuisance results from the negligent or improper operation of any farm or its appurtenances." (Emphasis added.) 740 ILCS 70/3 (West 2006).

Only the changed-conditions provision in section 3 is at issue in this appeal.

¶ 33     In denying defendants' summary judgment motion, the trial court found that the old farmhouse existed when defendants purchased their property in 1991 and that the cattle operation predated: the demolition of the old farmhouse, the subdivision and conveyance to plaintiffs of the 1.83-acre parcel, the construction of plaintiffs' home, and plaintiffs' move into their home. The court found that these changes did not constitute changed conditions as contemplated by section 3.

¶ 34     Defendants argue that the court's construction of the Act is erroneous. They urge that the court ignored the word "any" before the term "changed conditions" and, as a result, too narrowly interpreted the term. In defendants' view, the following changes constitute changed conditions on the property: (1) on the date the cattle farm began operations, the land across the street was unoccupied; currently, it is occupied; (2) on the date the cattle farm began operations, the land across the street was designated as agricultural land; now it is being used for nonagricultural purposes; and (3) on the date the cattle farm began operations, the land across the street spanned 200 acres; now it has been subdivided and includes a 1.83-acre plot used for residential purposes. Defendants argue that the term must be construed in the context of the subject the Act addresses, namely, the prevention of nonagricultural uses of land from extending into agricultural areas. They contend that this is precisely what occurred in this case: plaintiffs obtained 1.83 acres of agricultural land that had been unused and unoccupied for seven years and built a house on it, moved in, and then became disturbed by the farm operation across the street. Defendants contend that the plain meaning of "changed conditions" is broad and encompasses changes in land use and occupancy status.

¶ 35     Plaintiffs respond that the Act's purpose was never to thwart a family's succession plan. They note that the deed conveying the 1.83-acre parcel contains numerous restrictions, including a right of first refusal, designed to maintain family ownership in the land and to continue the family farm operation.

¶ 36     The interpretation of section 3 presents a question of first impression. Again, the relevant portion of that immunity provision states that "No farm *** shall be or become a *** nuisance because of any changed conditions in the surrounding area occurring after the farm has been in operation for more than one year, when such farm was not a nuisance at the time

it began operation ***." 740 ILCS 70/3 (West 2006). The foregoing language reflects that the changed condition must be the reason the farm becomes a nuisance: "shall be or become a *** nuisance because of any changed conditions." Thus, it is clear that section 3 may not be invoked merely for "any changed conditions." Rather, the conditions must alter the character of the surrounding area such that, where the farm was not a nuisance when it began operation, it is transformed into a nuisance by the changed conditions.

¶ 37    Applying this reading to the undisputed facts in this case, the question becomes whether the subdivision of the Toftoy property and the building of plaintiffs' home thereon transformed the cattle operation into a nuisance. We conclude that they did not and that, therefore, the Act's immunity provision is not triggered. These changes in and of themselves did not alter the character of the area such that the cattle operation, which previously had not been a nuisance, thereby became a nuisance. Contrary to defendants' assertion on appeal, when defendants purchased their property with the intention of running a cattle operation thereon, a tenant and her family resided in the old farmhouse on the portion of Clarence's property that was subsequently deeded to plaintiffs. (Even in 1992, when defendants commenced their cattle operation with the purchase of several cattle, defendants were aware that the unoccupied old farmhouse could conceivably be occupied again.) The subsequent subdivision of Clarence's property and transfer of ownership to plaintiffs does not alter the fact that, as in 1991, a family now resides in a home at the same location. These changes did not cause the cattle operation to become a nuisance.

¶ 38    *Souza v. Lauppe*, 69 Cal. Rptr. 2d 494 (Cal. Ct. App. 1997), does not compel a different conclusion. In *Souza*, the plaintiffs and the defendants farmed neighboring commercial farms. For about five years, the parties farmed rice on their lands. However, the plaintiffs switched to growing row crops and, after the change, they noticed that, when the defendants flooded their rice fields, the portion of their property closest to the defendants' land was flooding, making it difficult to grow the row crops. The plaintiffs sued the defendants, alleging that the water from the defendants' rice-growing operation was intruding on the plaintiffs' property and thereby causing a nuisance. The trial court granted the defendants summary judgment.

¶ 39    On appeal, the court affirmed, holding that the plaintiffs' substitution of row crops was a changed condition within the meaning of the California right-to-farm statute, which provides in relevant part that no farm "shall be or become a nuisance, private or public, due to any changed condition in or about the locality, after it has been in operation for more than three years if it was not a nuisance at the time it began" (Cal. Civ. Code § 3482.5(a)(1) (West 1996)). *Souza*, 69 Cal. Rptr. 2d at 500-01. Specifically, the court held that the claim of nuisance arose "due to" the changed condition in or about the locality. *Id.* The court rejected the plaintiffs' argument that the condition of their property had not changed, concluding that the substitution of row-crop farming for the different process of rice farming was a changed condition within the meaning of the statute. *Id.* Because the damages alleged by the plaintiffs occurred only after they changed the condition of their agricultural activity, the alleged harm arose due to a changed condition within the meaning of the statute. *Id.* at 501.

¶ 40    Here, the subdivision, transfer of ownership, and building of a new residence on the Toftoy property is not akin to the changed condition–a change from rice farming, which

involved the flooding of the fields, to row-crop farming, which suffered if subjected to flooding–at issue in *Souza*. Again, as in 1991, a family now resides in a home at the same location.

¶ 41    Section 3 of the Act does not bar plaintiffs' suit. Accordingly, the trial court did not err in denying defendants' motions for summary judgment and for a directed finding.

¶ 42                           B. Common-law Private Nuisance

¶ 43    Next, defendants argue that the trial court's findings concerning plaintiffs' common-law private nuisance claim were against the manifest weight of the evidence. For the following reasons, we disagree.

¶ 44    A common-law private nuisance is the substantial invasion of a person's interest in the use and enjoyment of his or her land. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 204 (1997). The invasion must be substantial, intentional or negligent, and unreasonable. *Id.* Whether particular conduct constitutes a nuisance is determined by the conduct's effect on a reasonable person. *Id.* A "nuisance must be physically offensive to the senses to the extent that it makes life uncomfortable." *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 375-76 (2010). In an action to enjoin a private nuisance, the trial court must balance the harm done to the plaintiff against the benefit caused by the defendant's use of the land and the suitability of the use in that particular location. *Carroll v. Hurst*, 103 Ill. App. 3d 984, 990 (1982). Whether a complained-of activity constitutes a nuisance is generally a factual question. *Pasulka v. Koob*, 170 Ill. App. 3d 191, 209 (1988). We review the court's findings under the manifest-weight-of-the-evidence standard. *Dobbs*, 401 Ill. App. 3d at 377-78.

¶ 45    First, defendants argue that the trial court's finding that the fly invasion was substantial was erroneous. "A substantial and intentional [odor and fly] invasion must be severe enough to constitute a material annoyance to the adjoining landowners and be foreseen as to its consequences by the offending landowner." *Woods v. Khan*, 95 Ill. App. 3d 1087, 1089-90 (1981). Defendants seize on the fact that plaintiffs' use of their land (*i.e.*, a residence on a small subdivision of land) is a nonconforming use under state law and local ordinances and argue that the nonconforming use precludes a finding that the invasion was substantial. Defendants note that Bobbie testified that plaintiffs were using their land for nonagricultural purposes although the land is located in an agricultural area. Defendants also note that plaintiffs are using the land as a location for a family residence, rather than for a farmhouse. They argue that the locality's character is agricultural. We reject defendants' argument because they ignore, first, that plaintiffs' use of their property is nevertheless lawful and, second, that plaintiffs complain that the amount of flies is substantial. Defendants do not address how the flies are *not* a material annoyance. See *id.* at 1090 (evidence supported court's finding that "odors and flies were sufficiently bothersome to justify injunctive relief"). The evidence here supported the court's finding that the invasion was substantial. Both Roger and Bobbie testified that, during fly season, it was difficult for them to enjoy their outdoor space. They testified that their horses were disturbed by the flies and that their children avoided playing outside. Further, Bobbie testified that the fly concentration on their home was every inch or half-inch and that, on one occasion, Roger's shirt was "covered solid

with flies." Williams' testimony that the flies were excessive confirmed plaintiffs' testimony. Although Ayers testified that the flies had never been bothersome at defendants' property, this discrepancy was for the trial court to resolve. We cannot conclude that its resolution in plaintiffs' favor was unreasonable, and we note that plaintiffs' testimony that the family wore long pants outside to avoid fly bites was confirmed by Ayers.

¶ 46 Defendants' second argument is that the trial court's finding that the invasion was unreasonable was against the manifest weight of the evidence. They argue that the court misapplied the relevant factors. In assessing whether an invasion is unreasonable, a court must, in balancing the interests, answer the following questions: (1) is the defendant engaged in a useful enterprise? (2) is the area well suited for the defendant's business? (3) what/who came first, the defendant's operation or plaintiffs? (4) can the invasion be reduced? and (5) is modification of defendant's operation practical? See *id.* The trial court answered the first two questions in defendants' favor and answered the remaining questions in plaintiffs' favor. On appeal, defendants argue that, as to the third factor, it is undisputed that they started their cattle operation in 1992 and that plaintiffs acquired their land in 1998 and moved into their residence in 2004. The trial court found that Clarence had purchased the original property in 1967; that Roger had been farming with his father since that time; that plaintiffs had boarded horses at the property since 1989; and that plaintiffs now own the surrounding 58 acres. We cannot conclude that the trial court's finding was unreasonable as to this factor, as Roger's testimony concerning his family's connection to the land, particularly his assistance in farming and plaintiffs' boarding the horses, showed that the property was part of a family operation.

¶ 47 As to the fourth and fifth questions, defendants assert that there was very little evidence presented as to whether the flies could be reduced and no evidence at all concerning whether modification of their operation would be practical. Relying on Ayers' testimony, the trial court found that the flies could be reduced. Ayers testified that he could have controlled the flies (if they had been a bother to him). We conclude that the trial court's findings as to the fourth, but not the fifth, question were reasonable. Thus, we have no quarrel with the trial court's assessment of four out of the five factors and conclude that its finding that the invasion was unreasonable was not erroneous.

¶ 48 In summary, the trial court's findings that the fly invasion was substantial and unreasonable were not against the manifest weight of the evidence. We thus affirm the declaratory judgment.

¶ 49                                    C. Injunction

¶ 50 Defendants' final argument is that the trial court's injunction was improper because it was vague and overly broad. We agree. "The mere existence of a nuisance does not automatically entitle the plaintiffs to injunctive relief against the nuisance." *Dobbs*, 401 Ill. App. 3d at 379. The granting of an injunction is within a trial court's discretion; on appeal, we will reverse the granting of an injunction only if the trial court manifestly abused its discretion. *Id.*

¶ 51 Although the trial court here initially expressed concern that no evidence had been

presented concerning injunctive relief, the court subsequently granted such relief. This, in itself is problematic. The court's April 30, 2010, order focuses not on any ultimate fly population goal, but on measures defendants must take to eliminate *potential* (which the order defines as "locations containing decomposing manure and vegetation (cellulose) which are often ignored over time during confinement area cleanup/scraping") *and active* ("locations containing live stable fly pupae and/or live stable flies") stable-fly breeding sites. It limits defendants' activities to the cattle-confinement and hay-bale-storage areas and explicitly excludes pastures.

¶ 52    We conclude that the trial court abused its discretion in granting injunctive relief because there was no evidence presented that the measures set forth in the injunction order would abate the fly nuisance. See *id.* at 379-80. At trial, the court sustained an objection to any testimony by Williams concerning whether the fly problem could be abated (because the topic was beyond the scope of his disclosed expertise). Further, the court's order that defendants have, after 2010, a "continuing obligation to maintain their cattle confinement and hay bale storage areas free from *potential* and active breeding sites for stable flies" is overly broad and, as defendants note, likely impossible to achieve. (Emphasis added.) " 'The restraint imposed by an injunction should not be more extensive than is reasonably required to protect the interests of the party in whose favor it is granted[ ] and should not be so broad as to prevent defendant from exercising his rights.' " *Id.* at 380 (quoting *People ex rel. Traiteur v. Abbott*, 27 Ill. App. 3d 277, 282-83 (1975)). So, too, is the court's order that defendants in 2010 (on a weekly basis from May 1 to November 1) "remove all moist bedding and manure from cattle confinement and hay bale storage areas (*potential* breeding sites)–to disrupt the stable fly breeding cycle, and with particular attention to areas around feeders, tanks, hay bales, fences and gates (moving them if necessary to access the moist debris), and all other areas inaccessible to machine scraping." (Emphasis in original.) Further, the order does not take into consideration (because no evidence was presented on the issue) the economic feasibility of complying with the injunction (including the weekly cleanings and the employment of a "professional inspector," a term that the court did not define).

¶ 53    In summary, we vacate the injunction. The parties do not request that we remand for a hearing so that a proper injunction may be entered and, so, we do not order a remand.

¶ 54                                                    III. CONCLUSION

¶ 55    The judgment of the circuit court of Kendall County is affirmed in part and vacated in part.

¶ 56    Affirmed in part and vacated in part.

¶ 57    JUSTICE HUTCHINSON, specially concurring in part and dissenting in part:

¶ 58    While I agree with the majority's decision to vacate the injunction, I believe that the Act applies to plaintiffs' lawsuit; as a result, defendants' cattle operation in a rural area during

"fly season" would not constitute a nuisance without an allegation that the fly invasion resulted from defendants' improper or negligent operation of the cattle farm. Therefore, defendants' cattle operation is not subject to an injunction. In declining to apply the Act, the majority fails to adhere to the statute's clear intent of providing farms broad protection from nuisance suits. Moreover, despite the majority's citation to a Wisconsin law review article stating that a pig cannot become a nuisance merely because a parlor is built near the barnyard, the same majority fails to recognize that this is precisely what occurred here. See Grossman, *supra*, at 98.

¶ 59    As the majority notes, the purpose of the Act is to "reduce the loss to the State of its agricultural resources by limiting the circumstances under which farming operations may be deemed a nuisance." 740 ILCS 70/1 (West 2006). Toward that end, section 3 of the Act provides that a farm shall not become a nuisance as the result of "any changed conditions in the surrounding area" so long as the farm has been in operation for more than one year. 740 ILCS 70/3 (West 2006). Section 3 further provides that the protection provided by the Act is not applicable if the alleged nuisance results from the negligent or improper operation of the farm. *Id.* By using the word "any" to modify the term "changed conditions to the surrounding area," the legislature clearly intended for the Act to be broadly applied to protect farms from nuisance suits. See *Gardner v. Mullins*, 234 Ill. 2d 503, 511 (2009) (noting that the primary objective of statutory interpretation is to give effect to the intent of the legislature, and the most reliable indicator of such intent is the language of the statute given its plain, ordinary, and popularly understood meaning); Webster's Ninth New Collegiate Dictionary 93 (1990) (defining the word "any" as "unmeasured or unlimited in amount, number, or extent" and "appreciably large or extended").

¶ 60    In declining to apply the Act, the majority concludes that the Act should not be invoked for merely "any changed conditions." *Supra* ¶ 36. Instead, the majority focuses on the language in section 3 that provides that no farm shall become a nuisance when the farm has been in operation for more than a year and was not a nuisance when it began its operation. The majority concludes that, for a defendant to invoke immunity under the Act, "the conditions must alter the character of the surrounding area such that, where the farm was not a nuisance when it began operation, it is transformed into a nuisance by the changed conditions." *Supra* ¶ 36.

¶ 61    While I agree that there must be some nexus between the "changed conditions" in the surrounding area and the farm becoming a nuisance, the majority's restrictive interpretation of section 3 is inconsistent with the statute's plain language. The Act expressly provides that a farm shall be protected from nuisance suits resulting from "any" changed conditions in the surrounding area, regardless of whether the character of the surrounding area also changes. If the legislature intended to condition the Act's qualified immunity on alterations in the "character" of the surrounding area, and not on "any" changed conditions in the surrounding area, it could have expressed such an intent in the plain language of the Act. It did not do so. In my view, the majority is reading into the Act a condition that was not expressed by our legislature. See *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007) ("[A court] must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent.").

¶ 62    A broad application of the Act to protect farms from nuisance suits is consistent with interpretations that courts in other jurisdictions have afforded right-to-farm statutes containing similar language. Although the majority briefly discusses *Souza*, 69 Cal. Rptr. 2d 494, I believe that it is highly persuasive in the current matter. In *Souza*, the California Court of Appeals addressed whether a nuisance suit should be barred by a California statute providing that an entity engaged in agricultural activity for more than three years shall not become a nuisance "due to any changed condition in the locality if the activity did not constitute a nuisance when it began." *Id.* at 496 (citing Cal. Civ. Code § 3482.5(a)(1) (West 1996)). In that case, the plaintiffs owned a parcel of land that had been farmed since 1945. The plaintiffs planted row crops prior to the 1970s and thereafter planted rice until 1988, when they shifted back to planting row crops. *Id.* at 496-97. The defendants farmed rice on an adjacent parcel of land since as early as 1983, when the plaintiffs were still farming rice. Sometime after the plaintiffs switched back to farming row crops, they noticed that, when the defendants' rice fields were flooded, the portion of the plaintiffs' farm closest to the defendants' land became so wet that it could not be properly farmed for row crops. The plaintiffs attributed reduced yields from their sugar beet and safflower crops to excessive seepage of water from the defendants' rice-farming activities. *Id.* at 496. The plaintiffs filed suit against the defendants, and the trial court deemed the plaintiffs' claims to be based on a theory of nuisance because the plaintiffs alleged a violation of a single primary right–the plaintiffs' unimpaired ownership and undisturbed enjoyment of their premises. *Id.* at 497. The trial court granted summary judgment in favor of the defendants after concluding that section 3482.5 barred the plaintiffs' lawsuit because they had changed the use of their land in 1989 by growing crops other than rice. *Id.*

¶ 63    In affirming the trial court, the California Court of Appeals rendered its analysis in two parts. First, the reviewing court concluded that the statute could bar a nuisance suit commenced by one farm against another farm. *Id.* at 499. In addressing that issue, the court rejected the plaintiffs' assertion that the statutory phrases "any changed condition" and "in or about the locality" were ambiguous. Specifically, the court stated:

> "We discern no such ambiguity in the phrases 'any changed condition' and 'in or about the locality.' That the phrases encompass countless varieties of change in all manner of conditions in the general area surrounding the alleged nuisance does not mean the language of the statute is ambiguous. To the contrary, the word 'any' expresses an unambiguous legislative intent to broadly apply the statute." *Id.*

¶ 64    Second, the California Court of Appeals rejected the plaintiffs' assertion that their lawsuit was not barred because the defendants failed to satisfy the statute's requirement that the nuisance resulted from any changed condition in or about the locality. According to the plaintiffs, no change occurred, because their property had been used as a commercial farm since 1945, was being used as a commercial farm when they noticed that their crops were being harmed by the water seeping from the defendants' farm, and the "change from row crops to rice and back to row crops" did not change the condition of the property as a commercial agricultural activity. Therefore, the plaintiffs maintained, their change in agricultural activity should not be considered a "changed condition" within the meaning of the statute. *Id.* at 500. The reviewing court disagreed, stating:

"[T]he statute applies to 'any' changed condition, and the definition of 'change' includes 'to make substitution for or among.' (Webster's New International Dict. (3rd ed. 1993) p. 373.) Applying this common usage as we must, we conclude [the] plaintiffs' 'substitution' of row crops for the 'different' process of rice farming was a 'changed condition' within the meaning of section 3482.5, subdivision (a)(1). [Citations.]" *Id.* At 500-01.

¶ 65    Given the significant similarities between California's right-to-farm statute and the Act, *Souza* is highly persuasive. The language in the Act is substantively equivalent to the language present in the California statute. As the court in *Souza* noted, the statute's use of the word "any" expressed a clear legislative intent that the statute be broadly applied. Similarly here, our legislature's use of the word "any" to modify the phrase "changed conditions in the surrounding area" represents an express intent that the statute be broadly applied. This interpretation is consistent with the purpose of the Act outlined in section 1–to reduce the loss to the state of its agricultural resources.

¶ 66    I further agree with the court in *Souza* that the word "change" has a commonly used definition, which is "[a]n alteration; a modification or addition; substitution of one thing for another" (Black's Law Dictionary 231 (6th ed. 1990). "Condition" is also commonly defined as "[m]ode or state of being; state or situation; essential quality; property; attribute; status or rank" (Black's Law Dictionary 293-94 (6th ed. 1990)). That the legislature used the word "any" to modify the phrase "changed conditions" without expressing any other limitation or condition on what constitutes a changed condition is indicative of the legislature's intent to have the Act be broadly applied. The majority swats away the rationale and holding in *Souza* merely because, in the current matter, a family had lived in the farmhouse before defendants began operating their cattle farm–although not *when* defendants began operating their cattle farm–without addressing the holding in *Souza* that the word "any" expresses an unambiguous legislative intent to have the statute broadly applied. Distinguishing *Souza* from the current matter, therefore, merely became a perfunctory exercise.

¶ 67    The future implications of the majority's decision will leave farms with no defenses against baseless nuisance suits. When defendants began operating their cattle farm in 1992, it was adjacent to a parcel of land owned by Clarence consisting of 200 acres. As the majority acknowledges, the farmhouse across the street from defendants' cattle farm was unoccupied. The record is devoid of any indication that defendants' cattle operation was a nuisance when it began operating. For at least the next five years, until 1997, the farmhouse remained unoccupied and unchanged until Clarence began the process of tearing down the old farmhouse and plaintiffs built a new home to be used as their primary residence. Clarence deeded to plaintiffs 1.83 acres of land in 1998 and 58 additional acres in 2002; those actions constituted a distinct subdivision of the land and amounted to a change. Plaintiffs moved into the new residence in 2004. At some point after plaintiffs began residing in their new home in 2004 and before filing suit, defendants' 12-year cattle operation allegedly became a nuisance.

¶ 68    Pursuant to the Act's plain and unambiguous language, the above sequence of events unquestionably demonstrates that the area surrounding defendants' cattle farm experienced "changed conditions." As noted above, when defendants began their cattle operation, it was

-15-

located next to a parcel of land consisting of 200 acres that included an unoccupied farmhouse and remained unchanged for at least the next five years. Conversely, when plaintiffs brought this nuisance suit in 2007, the area surrounding defendants' cattle farm included (1) an independent 1.83-acre parcel of land, which was not taxed as farmland, that contained a newly built house being used as a primary residence; (2) an independent 58-acre parcel of land; and (3) the remaining part of Clarence's farm. These changes in the surrounding area clearly fall within the broad statutory phrase "any changed conditions to the surrounding area," as exemplified in *Souza*.

¶ 69 Moreover, the majority's emphasis on what defendants knew when they started their cattle operation is antithetical to an analysis of a nuisance action. According to the majority, because there was an unoccupied farmhouse across the street when defendants started their cattle operation, they were aware that the farmhouse could be occupied again. *Supra* ¶ 37. For what it is worth, though, the majority's reasoning is also applicable to plaintiffs, who must have known that a cattle operation was located across the street from the land where the unoccupied farmhouse was located and where they chose to build a new house to use as their primary residence. But more important, the Act is premised on the theory that, as agricultural practices often yield unsavory conditions, and as nonagricultural uses of land increasingly spread to agricultural areas, farms are increasingly subject to nuisance suits. Thus, by limiting the circumstances under which a plaintiff can bring a nuisance action, the Act places potential plaintiffs on constructive notice that, when they move into a rural or an agricultural area, they might encounter odors or flies. That is why pursuant to the Act, to defeat a defendant's immunity, the burden is on the plaintiff to demonstrate that a nuisance coming from an agricultural entity results from improper or negligent operation. See 740 ILCS 70/3 (West 2006). Therefore, defendants were not required to defend themselves with respect to what they knew or should have known regarding potential urbanization in the surrounding area when they commenced their cattle operation 12 years before plaintiffs moved in across the street, and such an inquiry bears no relevancy on the issue of whether the Act should provide defendants' immunity in this action.

¶ 70 Finally, the majority's conclusion that the changed conditions that occurred in the area surrounding defendants' farm "did not cause the cattle operation to become a nuisance" is equally misplaced. *Supra* ¶ 37. Defendants began operating their cattle farm in 1992. Naturally, given the nature of their agricultural activities, some amount of flies would have been present near defendants' farm. Roger Toftoy testified that plaintiffs had experienced "fly season" before they moved into their home. Nonetheless, defendants' farm was not alleged to have constituted a nuisance during the several years the farm was in operation when the farmhouse across the street was unoccupied. Only after plaintiffs–despite presumably being aware that a cattle operation was located across the street–voluntarily accepted title to the land on which the unoccupied farmhouse was located, built a new house more suitable for use as their primary residence, and then moved into the new residence did defendants' farm suddenly became a nuisance. In other words, the record is devoid of any indication that, had plaintiffs not acquired the land and decided to build a new house and then move into the new house, defendants' farm would be causing an alleged nuisance. I believe that defendants' cattle farm, *i.e.*, the pig, became a nuisance only after plaintiffs

acquired the land and decided to build and move into a new residence, *i.e.*, the parlor, despite knowing that a cattle farm had been in operation across the street for more than a year.

¶ 71      Because I believe that defendants cattle operation is not subject to an injunction, I would vacate the injunction and I would have reversed the declaratory judgment.